LA SUCESIÓN DE VICTORIA CAPELLA Y OTROS, demandantes y recurridas, *v.* IGLESIA DE DIOS PENTECOSTAL, INCORPORADA, demandada y recurrente.

Número: R-69-306       Resuelto: 21 de febrero de 1974

*Alberto Picó,* abogado de la recurrente; *Estrella García Capella,* abogada de las recurridas.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

No pretendemos deslindar los predios de Dios y del Estado. Nuestra encomienda puramente terrenal es armonizar la libertad de culto con la libertad de vivir en paz en su casa.

Nadie puede sustraer sus actos y conducta a las reglas que por legislación ha establecido la sociedad en protección de la paz, la moral y el orden público. La práctica religiosa no crea un cantón aparte donde le está vedado al Gobierno hacer

respetar las leyes. (¹) (*Reynolds* v. *United States*, 98 U.S. 145 (1878) 25 L.Ed. 244.) De otro modo, bajo el manto de inmunidad religiosa y con la irrestricta libertad constitucional para rendir culto al Creador dentro y fuera de iglesias reconocidas, podrían desarrollarse prácticas que por tener la desaprobación general están definidas como delitos con sanción punitiva en las leyes penales. (²) En fin, la libertad de culto escrita en la Constitución es patrimonio del ser racional y derecho inalienable del hombre a cumplir lo que crea ser su obligación de conciencia ante el misterio de la vida, pero no es licencia para crear un mundo aparte intocable y autócrata capaz de trastocar impunemente los sensitivos equilibrios del todo armónico que es la sociedad política.

El vértigo de la vida moderna deja libres muy pocos momentos para la reflexión sin la cual no habrá un cabal entendimiento de las libertades. Unicamente el hogar brinda esos momentos de serenidad en que además de partir el pan con los suyos pueda el hombre encauzar su existencia y la de su familia entre lo conocido y el arcano que nos ofrece la vida. (³) Sin esas oportunidad para la serenidad y la reflexión

---

(¹) Comentando a *Reynolds*, supra, dice el Prof. Pfeffer: "La libertad de mantener creencias y opiniones religiosas es absoluta. Sin embargo, lo aquí envuelto es la libertad para actuar, y ésta, aun cuando motivada por convicciones religiosas, no está totalmente libre de restricciones legislativas. Así, por ejemplo, el hecho de que la poligamia sea un mandato positivo de la religión Mormona no impide al gobierno declararla ilegal y considerar su práctica ilegal." Pfeffer, *Church, State and Freedom*, pág. 284, ed. 1967.

(²) "Ninguna sociedad bien organizada puede dejar en los individuos un derecho absoluto a hacer decisiones finales, inatacables por el Estado, respecto a todo cuanto ellos quieran o no quieran hacer. La Primera Enmienda no va tan lejos. Las confesiones religiosas honestamente practicadas no relevan al individuo de su responsabilidad de conducirse con obediencia a leyes que, o son imperativamente necesarias para proteger la sociedad como un todo de graves e inminentes peligros, o que sin contener una prohibición general, simplemente regulan el tiempo, lugar y manera de la actividad religiosa." *West Virginia State Bd. of Educ.* v. *Barnett*, 319 U.S. 624, 643, 644 (1942), 85 L.Ed. 1628, 1640.

(³) Uno de los valores más preciados de la vida civilizada es la vivienda, que sin ser fastuosa sea tranquila, serena y agradable; el hogar en el cual el ser humano busca tranquilidad espiritual y física luego de un

que van reduciéndose paulatinamente, ha dicho el Juez Frankfurter, [4] la libertad de pensamiento se torna en burla, y sin libertad de pensamiento no puede existir una sociedad libre. No concebimos derecho de posición preferente a la libertad de estar y sentirse tranquilo en su casa.

La libertad personal y la privacidad de los recurridos están gravemente perturbadas por los ejercicios y ritos de un templo de la Iglesia de Dios Pentecostal que el juez de instancia en sus conclusiones describe en parte así: ". . . se expresan en alta voz, producen palmadas con sus manos, usan distintos instrumentos musicales de viento y percusión tales como cornetas, clarinetes, platillos y otros, se lanzan contra el suelo, dan con los pies en el piso, cantan himnos en alta voz, en forma estentórea, de tal modo que dicho ruido producido por sus voces y por los distintos instrumentos musicales que utilizan trasciende el ámbito del local y se esparce por los alrededores produciendo incomodidad, malestar y desasosiego entre los vecinos del sector." [5] Algunos vecinos se han mudado,

---

día gastado en la lucha económica de la sociedad industrial contemporánea. *Torres* v. *Rodríguez*, 101 D.P.R. 177 (1973).

[4] *Kovacs* v. *Cooper*, 336 U.S. 77, 89 (1949), 93 L.Ed. 513, 528.

[5] Una maestra describe su experiencia:

"R. . . . No puede decir que es mala fe o lo que sea, pero la iglesia tiene unos ritos religiosos, cosa que ellos quizás no se dan cuenta, pero a los que estamos frente fuera nos perturba verdaderamente nuestra paz, tanto espiritual como material.

"P. ¿A qué iglesia se refiere usted?

"R. Yo me refiero a la iglesia que queda al frente de la casa de la señora García Capella.

"P. ¿Usted sabe el nombre de la iglesia?

"R. La Iglesia de Dios Pentecostal, algo así.

"P. Tenga la bondad de explicarle al Tribunal, si usted pudo observar, en qué consisten los ritos y ceremonias o servicios religiosos.

"R. Parece que ellos tienen por costumbre usar ciertos instrumentos musicales y quizás al recibir ellos esas cosas que reciben, sin darse cuenta, como ellos están allá dentro, no saben lo de afuera, la alegría de ellos es muy fuerte. Es tan fuerte el impacto, que tiene allí, una cosa junta, las griterías, cánticos, las caídas al piso, instrumentos y todo junto, es fuerte, fuerte para los que estamos afuera. Quizás para ellos, que están dentro no, pero sí para los que están afuera." (T.E., To. I, págs. 192-193.)

otros abandonan su residencia por el tiempo que duran dichas prácticas que tienen lugar tres o cuatro veces por semana de 7:00 P.M. a 10:00 P.M. y los domingos y días feriados en horas del día; los recurridos y demás vecinos están arbrumados por la angustia, irritación y la desesperación, consecuencia del volumen de ruido que se origina en el templo y que el juez de instancia califica de "magno escándolo". Los vecinos se ven forzados a encerrarse en sus hogares, no pueden ver televisión ni solazarse en forma alguna, tienen que comunicarse en voz alta y los de edad escolar no pueden estudiar en la casa. A pesar del largo tiempo transcurrido desde la pre-

.      .      .      .      .      .      .      .

"P. . . . ¿Cómo son? [los servicios religiosos].

"R. En una forma completamente alarmante.

"P. ¿En qué consiste la alarma?

"R. Porque una, en esa cosa de ellos, se siente desorientado completamente, como que también pierde algo de uno. A mí me afecta bastante. Muchísimo, digo, me ha afectado a mi sistema nervioso y a mi propia persona.

"P. ¿En qué consiste la afección?

"R. La afección consiste en que si uno no se sabe controlar, sale corriendo como los locos también, o entra a hacer lo mismo o sale corriendo para otro lado." (T.E., Tomo I, pág. 194.)

.      .      .      .      .      .

"P. ¿Qué era lo que la hacía llorar?

"R. El mucho ruido. Era algo alarmante, muy alarmante, sinceramente hablando.

"P. En qué consistía la alarma?

"R. No puedo descifrar, porque no estaba dentro. Yo sé que veía de esos aparatos grandes que tocan, que se da duro. Y se sentían platillos y sentía gente que se caía y sentía taconeos. Lo que sentía era de afuera, porque yo nunca entré allí. Tampoco quiero. Puede que ellos, como están allá dentro, no se den cuenta del efecto que hacen afuera. Como están todos en la misma forma, quizás no se dan cuenta del efecto que hacen, pero hacen un efecto bastante alarmante y perjudicial a uno. (T.E., To. I, págs. 195–196.)

.      .      .      .      .      .      .

"P. Claro, usted declaró que no le molesta la iglesia.

"R. Nunca la iglesia me ha molestado. Yo lo que digo son los ritos, la forma de ceremonia, que quizás sin ellos saberlo, me molestaron en la época que estuve allí. No quiere decir que lo hagan de mala fe, pero molesta." (T.E. To. I, pág. 203.)

sentación de la demanda la perspectiva no es halagadora a juzgar por la expresión de uno de los feligreses: "esa gente nos ha demandado porque nosotros alborotamos pero se van a tener que tapar los oídos." Como remedio a esta situación el tribunal de instancia, fundado en la Sec. 2761 del Título 32 de las Leyes de Puerto Rico Anotadas, (⁶) ordenó a la iglesia recurrente que tome las medidas necesarias para aislar el ruido.

Este caso presenta un conflicto entre dos derechos fundamentales que ya antes de su inclusión en el texto de las constituciones de los pueblos libres se conceptuaron derechos naturales: la libertad de culto (Art. II, Sec. 3 de la Constitución del Estado Libre Asociado de Puerto Rico) ; y el derecho a la vida, a la libertad y al disfrute de la propiedad (Art. II, Sec. 7 de la misma Constitución). (⁷)

La libertad religiosa no es untura de inmunidad que releve a los profesantes de observar y respetar las leyes bajo las cuales se ha organizado la sociedad, y que recogen en su preceptos los principios de paz, de moral y de orden público.

---

(⁶) Sec. 2761. *Perturbación, definición de; acción para obtener su cese.*
"Todo lo que fuere perjudicial a la salud, indecente u ofensivo a los sentidos, o que interrumpa el libre uso de la propiedad, de modo que impida el cómodo goce de la vida o de los bienes, constituye una acción. Dicha acción podrá ser promovida por cualquiera persona cuyos bienes hubieren sido perjudicados o cuyo bienestar personal resulte menoscabado por dicha perturbación; y la sentencia podrá ordenar que cese aquélla así como decretar el resarcimiento de los perjuicios.—Código Enj. Civil, 1933, art. 277."

(⁷) Art. II, Sec. 3.
"No se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio del culto religioso. Habrá completa separación de la iglesia y el estado."
Art. II, Sec. 7.
"Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. No existirá la pena de muerte. Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes. No se aprobarán leyes que menoscaben las obligaciones contractuales. Las leyes determinarán un mínimo de propiedad y pertenencias no sujetas a embargo."

Concedido que la vida interior y la obligación de conciencia están fuera del alcance de cualquier regulación por el Estado, no lo está la conducta externa de los practicantes. "Las leyes se hacen para gobernar los actos, y si bien no pueden intervenir con las creencias y opinión religiosa, sí pueden hacerlo con la práctica." Konvitz, *Bill of Rights Reader*, 2da. ed., pág. 56.

En los albores de la historia constitucional norteamericana, Jefferson sintetizó el principio en el preámbulo del estatuto adoptado por la Cámara de Delegados de Virginia en 1784 al escribir: "Permitir que el magistrado civil entremeta su poder en el campo de la opinión, y restringir la convicción o difusión de principios bajo el supuesto de su tendencia perniciosa es una falacia peligrosa que de inmediato destruye toda libertad de religión; será llegado el momento de los legítimos fines del gobierno civil y de sus funcionarios para intervenir cuando los principios se desborden en actos manifiestos contra la paz y el buen orden." Konvitz *opus*, págs. 53–54. El derecho a la libertad de culto con toda su gran respetabilidad que en algunos criterios constitucionales le ha ganado un trato preferente, se ejerce por lo regular no en páramos aislados y solitarios sino en el centro mismo de nuestros pueblos y vecindarios, y su práctica no está inmune a la intervención moderadora del Estado cuando en alguna forma excede la proporción razonable de inconvenientes y molestias, inevitable concomitante de la vida en núcleos civilizados. El "récord" de este caso presenta suficiente demostración [8] de que hay seres humanos sometidos a tortura y angustia en su propio hogar

---

[8] La facultad del Gobierno, bajo la Constitución para suprimir la expresión oral sólo para proteger a otros de oírla depende de una demostración al efecto de que sustanciales derechos de intimidad (*privacy*) están siendo invadidos de modo esencialmente intolerable. *Cohen* v. *California*, 403 U.S. 15–21 (1971), 29 L.Ed.2d 284, 291; *Hess* v. *Indiana*, 94 S.Ct. 326 (1973), 38 L.Ed.2d 303.

por el persistente estremecimiento de su sensibilidad y ante una situación así el Estado no puede abstenerse. ([9])

■ La protección constitucional ampara la libertad de conciencia mas no la libertad de torturar. El Estado no puede intervenir con la devoción y creencia religiosa pero sí con el método de sus practicantes cuando éste hiere y lastima hasta anular el derecho de intimidad (*privacy*) de la familia. De negar su interposición, el Gobierno estaría claudicando su obligación de garantizar a todos la igual protección de las leyes (Art. II, Sec. 7, Constitución del Estado Libre Asociado de Puerto Rico), porque no tienen los observantes del culto Pentecostal más derecho a sus disonancias y estrépitos que sus vecinos al recogimiento hogareño. No puede darse derecho contra derecho ni verdad contra verdad. Aun la cuestionable "posición preferente" de algunos derechos no confiere la atribución de anular el de los demás, toda vez que ninguna de las libertades es absoluta. Los preceptos de la Carta de Derechos no se eliden sino que se refuerzan unos a otros. ([10])

Que la iglesia de los recurrentes existió por años en su ubicación actual antes de que la familia recurrida comprara casa en dicho vecindario no es elemento decisivo, vistos los hechos. No es cuestión de ocupar el campo y por la sola razón de llegar primero convertirlo en territorio donde nadie más tendrá derechos constitucionales, creando una especie de mo-

---

([9]) El "bombardeo" de la sensibilidad (Harlan, J.) en *Cohen* v. *California,* supra, presente en la agresión acústica genera extremado sufrimiento moral y grave perjuicio al organismo humano.

"La exposición prolongada al ruido intenso causa la pérdida permanente de la facultad auditiva. Niveles mucho más bajos de ruido, sin embargo, menoscaban la conversación normal, impiden todo esfuerzo de concentración mental, inducen la tensión, causan ineficiencia en el trabajo, imposibilitan el sueño, producen irritabilidad y frustran el descanso y la diversión. Finalmente, aparte de consideraciones de salud y productividad humana, al igual que los ríos contaminados, el aire saturado de humo y la fealdad de los arrabales, el ruido degrada la calidad de nuestras vidas y nos priva del disfrute de la vivienda urbana." Anthrop, *"The Noise Crisis",* University of Toronto Law Journal, Vol. 20, No. 1 (1970), pág. 1.

([10]) Pfeffer, en *Rights of the Americans,* pág. 342.

nopolio de la libertad. Todos los derechos fundamentales son parte de la misma constitución en cuyo contexto están entretejidos. (Frankfurter, J., en *Kovacs*, citado.)

■ Tampoco nos impresiona que la esquina de las calles Sol y Cruz donde surgió el conflicto está envuelta en otros ruidos normales en el tráfico de personas y vehículos en una capital moderna como lo es San Juan, y se ha dicho que esto es parte del precio por vivir en una comunidad civilizada aun en una zona principalmente residencial. En tránsito por las calles y demás sitios públicos somos "audiencia cautiva" que muchas veces ha de soportar espectáculos, sonidos y propaganda indeseable por tolerar el derecho de otros a comunicarse, pero ello no significa que sigamos "cautivos" de todas esas expresiones objetables en el santuario del hogar. *Public Utilities Commission* v. *Pollak*, 343 U.S. 451 (1952), 96 L.Ed. 1068; *Rowan* v. *United States Post Office*, 397 U.S. 728, 738 (1970), 25 L.Ed.2d 736, 744. Reconocemos el valor de avivamiento espiritual y aleccionamiento en solidaridad humana presente en la prédica religiosa de la recurrente pero el Estado no puede demostrarse insensible a la tortura y extremo sufrimiento moral de las personas cuya intimidad (*privacy*) ha sido anulada por esta práctica.[11] La sociedad contemporánea es fundamentalmente laica y si bien a la gente le agradan las muestras tanto públicas como privadas de religiosidad, en su ánimo cala más hondo y genera más pasión y fervor la preservación de sus derechos y libertades. *Kovacs* v. *Cooper*, citado; *Cantwell* v. *Connecticut*, 310 U.S. 296 (1940)

---

[11] "El caso de *Cantwell* v. *Connecticut*, 310 U.S. 296 reiteró la conocida regla de que el derecho a pensar y creer lo que uno quiera sobre religión es absoluto, mientras que el derecho a actuar y a hablar de acuerdo con esas creencias está sujeto a restricción en interés de la paz y el buen orden." Frank, *Cases on Constitutional Law*, ed. 1952, pág. 851.

"No importa lo libre que sea la práctica religiosa debe estar subordinada a las leyes criminales del país que sancionan actos generalmente conceptuados como objetos propios de legislación punitiva." *Davis* v. *Beason*, 133 U.S. 333 (1890), 33 L.Ed. 637.

84 L.Ed. 1213; *cf.* Prof. Pfeffer, *Rights of the Americans,* pág. 336.

■ La Iglesia de Dios Pentecostal, como otras tantas religiones, encarna una obligación de conciencia y una virtud que anima a sus profesantes a dar a Dios lo que ellos creen es en culto debido y hasta ese punto tiene a su favor toda la fuerza y protección constitucional. No vacilaríamos en reprimir cualquier perturbación del derecho a profesar su religión ordenadamente. Sin embargo, sus ritos y prácticas en las calle Cruz y Sol que en este caso específico el juez de instancia describe como "magno escándalo" en cuanto plantean una clara invasión del derecho de intimidad de santuario reconocido al hogar de las recurridas, infringe el Art. II, Sec. 7 de nuestra Constitución. La ley contra perturbaciones (32 L.P.R.A. sec. 2761) bajo la cual se trae esta acción civil es el remedio adecuado para reivindicar los derechos de los recurridos. Estos tienen derecho a exigir una "pared" que impida al ruido entrar a su casa como ya se ha impedido la entrada a publicaciones indeseables. *Rowan* v. *United States Post Office,* supra. "La familia es la natural y básica unidad grupal de la sociedad y es acreedora a la protección por ésta y por el Estado." Art. 16(3) de la Declaración Universal de los Derechos Humanos, proclamada por las Naciones Unidas en 10 de diciembre de 1948.

Todo cuanto aquí se expresa es una llamada a la moderación y hasta una esperanza de auto-restricción por parte de los feligreses en aras de la serenidad y buena convivencia a que debemos aspirar como estilo de vida en nuestra patria. Queda siempre el recurso a la fuerza coactiva de la Ley que es igual para todos cuando el remedio indispensable a la restauración del buen orden social no aflora en la voluntad y en la acción reparadora de quienes de algún modo lo han afectado.

El perjuicio aquí sancionado puede corregirse sin erogaciones cuantiosas y sin muchos exigir de la militancia de estos ardidos cristianos. Basta con aislar la sonoridad del templo,

solución que preservaría la paz de los vecinos y ganaría acogida y buena voluntad para la iglesia.

*Se confirmará la sentencia del tribunal de instancia.*