JOSÉ M. DÍAZ HERNÁNDEZ, PETRA VÁZQUEZ SANTIAGO y la SOCIEDAD DE GANANCIALES compuesta por ambos, demandantes y recurrentes, *v.* COLEGIO NUESTRA SEÑORA DEL PILAR, VICTORIANO RAMOS y MICAELA HURTADO, demandados y recurridos.

*Número:* RE-86-431 *Resuelto:* 8 de junio de 1989

766

*Paquito Rivera Rivera*, abogado de los recurrentes; *José A. Fernández-Paoli*, de *Martínez Álvarez, Fernández-Paoli, Menéndez Monroig, Menéndez Cortada y Lefranc Romero*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Este recurso nos permite explorar las fronteras del poder adjudicativo de los tribunales cuando una persona demanda a una institución de naturaleza religiosa por incumplimiento de contrato. La cuestión básica que debemos resolver es hasta qué punto las cláusulas religiosas de la Constitución del Estado Libre Asociado limitan el Poder Judicial para ventilar los méritos de una disputa relativa al contrato de trabajo entre una escuela parroquial y un maestro empleado por la misma.

En vista de las diferencias que han generado las cláusulas religiosas en la historia constitucional de Estados Unidos (véase L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, The Foundation Press, 1988, pág. 1154) es necesario primero definir cuidadosamente la cuestión planteada en este recurso para entonces limitar el alcance de nuestros pronunciamientos doctrinales. *Agostini Pascual v. Iglesia Católica*, 109 D.P.R. 172 (1979).

 Por último, también debemos recordar que la doctrina del ámbito mínimo federal limita el espacio que tienen los tribunales estatales al resolver controversias de esta índole:

Conviene tener presente también que la doctrina del "ámbito mínimo federal" (Cap. VIII, Sec. 6) tiene consecuencias especiales en los problemas atinentes a la religión. Esa doctrina sostiene la potestad de los estados, o Puerto Rico en su caso, de ofrecer mayor protección constitucional a los derechos individuales que la reconocida por la Constitución federal y su obligación de no dar protección menor que esa. Pero en materia de religión coexisten dos cláusulas constitucionales que, como vimos, están continuamente en tensión o conflicto. Por tanto, en lo tocante a la cláusula de establecimiento: (1) ningún estado, o Puerto Rico, podrían dar más ayuda a la religión que la aprobada por el Tribunal Supremo federal, y (2) si dan menos, para así lograr una mayor separación entre Iglesia y Estado, se corren el riesgo, en algunos casos, de violar la cláusula federal de libre ejercicio. En cuanto a esta úl-

tima cláusula: (1) no pueden dar menos protección que el mínimo federal y (2) si dan más se corren el riesgo, en algunos casos, de violar la cláusula federal de establecimiento. Además, en ciertas circunstancias, deben también cuidarse de no violar el "ámbito mínimo" de las garantías federales de libertad de expresión e igual protección de las leyes. R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., Vol. II, pág. 1711.

## I

El 2 de agosto de 1984 el Sr. José M. Díaz Hernández, su esposa Petra Vázquez Santiago y la Sociedad de Gananciales compuesta por ambos presentaron ante el Tribunal Superior, Sala de San Juan, una demanda sobre incumplimiento de contrato y daños contra el Colegio Nuestra Señora del Pilar (en adelante Colegio), el Padre Victoriano Ramos y la Srta. Micaela Hurtado, estos dos últimos director y principal, respectivamente, del referido plantel escolar.

Los demandantes alegan que durante el mes de mayo de 1984 el señor Díaz Hernández suscribió un contrato de servicios profesionales con la escuela para desempeñarse como maestro a cambio de una compensación anual de $12,000. Aducen que el Colegio despidió al codemandante Díaz Hernández sin mediar justa causa y reclamaron daños por la cantidad de $42,000, las costas del pleito y $5,000 por honorarios de abogado.

En su contestación, los demandados aceptaron que el señor Díaz Hernández y el colegio firmaron una carta, la cual califican de "precontrato", en la que se acordó la renovación del contrato para el próximo año escolar. Como defensa exponen que, con posterioridad al otorgamiento del referido documento, el maestro incurrió en conducta impropia y perjudicial a los intereses institucionales.

Luego de celebrada la conferencia con antelación al juicio, el tribunal de instancia limitó la controversia a la deter-

minación "de si medió o no justa causa para el despido del demandante [Díaz Hernández]". Minuta de 4 de noviembre de 1985 ante el Hon. Juez Ángel F. Rossy García, *Exhibit* J, Folio 28. Dos (2) semanas antes del juicio, el Colegio presentó una moción de desestimación en la cual planteó, por primera vez, que la controversia no podía ser objeto de escrutinio judicial porque el Colegio era una escuela intermedia y superior de orientación católica, operada y dirigida por la Iglesia Católica Apostólica y Romana de Puerto Rico (en adelante Iglesia Católica). En su escrito alegaron que la dirección del Colegio "deb[ía] quedar en libertad de emplear y despedir a los miembros de su Facultad . . . como sana medida administrativa para que se logre el propósito fundamental de la Escuela Católica". *Exhibit* K, Folio 32. Apoyaron su posición en lo resuelto en *Academia San Jorge v. J.R.T.*, 110 D.P.R. 193, 194–196 (1980), específicamente en la opinión concurrente del Juez Asociado Señor Martín.

Los demandantes se opusieron enérgicamente a la desestimación solicitada, y el día señalado para la vista en su fondo el tribunal de instancia la declaró sin lugar sin perjuicio de que una vez desfilada la prueba se pudiera considerar los méritos de la solicitud.

Los demandantes aportaron abundante prueba tanto documental como testifical. Dicha prueba giró, principalmente, en torno a las incidencias acaecidas en el Colegio entre la fecha en que el codemandante Díaz Hernández firmó la notificación de renovación del contrato y su eventual despido. De la exposición narrativa se desprende que presentó suficiente prueba como para hacer una determinación prima facie de que fue despedido por haber suscrito una carta, en su capacidad de representante de la Facultad, dirigida al Señor Cardenal Arzobispo de San Juan, en la cual le instaba a interceder por un grupo de profesores cuyos contratos no habían sido renovados por la administración del plantel.

Una vez presentada la prueba de los demandantes, los demandados levantaron una vez más el asunto de la desestimación y, luego de una breve argumentación, el tribunal solicitó de ambas partes memoriales de derecho y señaló la continuación del caso para el 20 de agosto de 1986.

El 4 de junio de 1986, antes de que las partes pudieran presentar sus respectivos memoriales y sin tener el beneficio de la prueba de los demandados, el Tribunal Superior dictó sentencia desestimatoria porque "a la luz de los hechos particulares de este caso, el entrar a considerar los méritos del mismo 'conllevaría una intervención que confligiría con los derechos constitucionales de la parte demandada —Artículo II, Sección 3 de la Constitución del Estado Libre Asociado de Puerto Rico . . .' ". *Exhibit* A, Folios 3–4.

Ante nos, los demandantes cuestionan la abstención judicial en una controversia contractual entre un maestro-laico y una escuela parroquial, actuación que priva al reclamante de ventilar sus alegaciones en ese foro. Sin pretender "deslindar los predios de Dios y del Estado" (*Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20, 21 (1974)), limitaremos nuestra encomienda a definir el ámbito del Poder Judicial en este tipo de controversia terrenal. Véase I.M. Ellman, *Driven from the Tribunal: Judicial Resolution of Internal Church Disputes*, 69 Cal. L. Rev. 1378, 1383 (1981).

## II

Durante los primeros siglos de nuestra historia la religión oficial del país fue la católica. Sin embargo, el cambio de soberanía, a raíz del Tratado de París, disolvió esa unión oficial. Véase A. Colón Rosado, *Relations between Church and State in Puerto Rico*, 46 Rev. C. Abo. P.R. 51 (1985). En 1902 la Asamblea Legislativa aprobó la "Ley Definiendo los Derechos del Hombre", 1 L.P.R.A. sec. 9, que garantiza por primera vez la libertad de culto. Serrano Geyls, *op. cit.*, págs. 1610–1611. Luego, en 1917, el Acta Jones prohibió el

establecimiento de cualquier religión y reafirmó la libertad de pensamiento religioso. También proscribió la asignación directa o indirecta de "dinero o propiedad públic[a] . . . para el uso, beneficio o sostenimiento de ningún sacerdote, predicador, ministro, u otro instructor o dignatario religioso . . .". Acta Jones, 39 Stat. 951, Documentos Históricos, Sec. 2, L.P.R.A., Tomo 1, ed. 1982, pág. 63.

Estas disposiciones tan estrictas se derivaban de la Ley Orgánica de 1916 para los filipinos y "se inspiraban claramente en el interés de las sectas protestantes, para evitar discrímenes en su contra, de establecer del modo más tajante posible en ambas comunidades católicas el principio de separación del estado y la iglesia". J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. Universidad de Puerto Rico, 1982, Vol. 3, pág. 176.

En la Convención Constituyente, los grupos protestantes apoyaron las garantías detalladas del Acta Jones para evitar que el predominio de la Iglesia Católica en Puerto Rico afectase la relación entre la Iglesia y el Estado. Por su parte, la Iglesia Católica abogó por un lenguaje general que reprodujese solamente las disposiciones de la Primera Enmienda a la Constitución de Estados Unidos. La Nueva Constitución de Puerto Rico, Informes a la Convención Constituyente preparados por la Escuela de Administración Pública, Río Piedras, Ed. Universidad de Puerto Rico, 1954, págs. 194–196. El debate fue particularmente intenso cuando se consideró la Sec. 5 sobre las ayudas públicas a las instituciones educativas. Véase Trías Monge, *op. cit.*, págs. 176–181. Finalmente, se aprobaron las cláusulas referentes a religión que se encuentran en las Secs. 1, 3 y 5 de la Carta de Derechos y en la Sec. 9 del Art. VI, Const. E.L.A., L.P.R.A., Tomo 1. En su conjunto, estas disposiciones son más abarcadoras que las de la Constitución federal.

■ La controversia ante nos requiere que limitemos nuestro análisis a la Sec. 3 de la Carta de Derechos, Const. E.L.A., *supra*, ed. 1982, pág. 262, la cual encarna los principios fundamentales:

No se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio del culto religioso. Habrá completa separación de la iglesia y el estado.

■ Esta sección, en su primera oración, coincide con las dos cláusulas religiosas de la Primera Enmienda de la Constitución de Estados Unidos: la que prohíbe el establecimiento de cualquier religión (*establishment*) y la que garantiza la libertad de culto. La segunda oración incorpora "la teoría de Madison de que la relación ideal entre el Estado y la Iglesia exige el reconocimiento de dos esferas de acción separadas". *Agostini Pascual v. Iglesia Católica*, supra, pág. 175.

■ Al interpretar las cláusulas religiosas conviene tener presente que fueron redactadas como objetivos generales para ser interpretadas a través de la historia del país en forma consistente con los pronunciamientos del Tribunal Supremo federal sobre la Primera Enmienda. Así lo expuso claramente el delegado Trías Monge en el debate en la Convención Constituyente.

. . . [A]quí hay dos principios básicos que se instituyen. . . . Uno es el principio de separación del Estado e Iglesia, tal como ha sido consignado en la Constitución federal y el cual seguirá su desarrollo normal vía las interpretaciones del Tribunal Supremo de los Estados Unidos.

. . . O sea, son nuestras las garantías en cuanto a libertad de religión que se han instituido en la Constitución de los Estados Unidos. Estamos idénticamente, formando parte de ese sistema constitucional. . . .

. . . [M]uchas veces no se podrá predecir exactamente el impacto en ciertas áreas . . . pero ahí están, naturalmente, las decisiones del Tribunal Supremo de Estados Unidos, y sus de-

cisiones sobre esta área tan importante de los derechos humanos privarán y regirán a Puerto Rico en este sentido.(1)

■ Aunque podemos impartirle más protección a los derechos individuales consagrados en nuestra Constitución que la que ha reconocido el Tribunal Supremo federal para disposiciones análogas de la Constitución norteamericana, con relación a las cláusulas religiosas debemos ser particularmente cuidadosos en el reconocimiento de estas garantías adicionales para evitar malograr el delicado equilibrio entre los dos mandatos absolutos conflictivos: el de no establecer religión alguna y el de no inhibir el libre ejercicio del culto religioso.(2) Véase *Agostini Pascual v. Iglesia Católica*, supra. La extensa y a veces conflictiva jurisprudencia del Tribunal Supremo federal sobre este asunto refleja las dificultades inherentes de esta delicada tarea. Compárese *Walz v. Tax Commission*, 397 U.S. 664, 668–669 (1970), con *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989). No obstante, con propósitos ilustrativos y comparativos debemos acudir a esta extensa jurisprudencia que provee un amplio marco conceptual para nuestro análisis constitucional.

### III

En esencia, este recurso debe resolver si los tribunales de justicia de Puerto Rico pueden ejercitar su jurisdicción —de forma compatible con la Constitución— para dilucidar los méritos de una disputa relativa al contrato de trabajo entre un maestro de una escuela católica y la dirección de ésta. La controversia no había sido resuelta anteriormente por este Tribunal.

---

(1) 2 Diario de Sesiones de la Convención Constituyente 1483–1484 (1961).

(2) Para una defensa de una interpretación "separacionista" de la Constitución de Puerto Rico, a la luz de nuestro particular trasfondo histórico, véase J.R. Toro Morales, *La viabilidad constitucional del uso de facilidades escolares públicas para reuniones estudiantiles con fines religiosos*, 57 Rev. Jur. U.P.R. 699, 723–733 (1988).

*Academia San Jorge v. J.R.T.*, supra, es claramente distinguible de este caso y, además, la sentencia emitida en ese recurso no constituye precedente ni obligaba al foro de instancia. Regla 44(c) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A; *Rivera Maldonado v. E.L.A.*, 119 D.P.R. 74 (1987).

A diferencia de *Academia San Jorge v. J.R.T.*, supra, la controversia en el caso de autos gira en torno a la interpretación de un contrato de trabajo *libremente negociado y acordado*. No estamos ante la aplicación de la Ley de Relaciones del Trabajo de Puerto Rico.[3] La participación del Estado a través de los tribunales, cuando se trata de una disputa contractual, es muchísimo menos penetrante e incisiva en la operación de la escuela católica que la intervención de la Junta de Relaciones del Trabajo en la implantación del principio de negociación colectiva compulsoria. Véase Art. 8 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 69.

El Poder Judicial no actúa como adversario de parte alguna, sino como árbitro para evitar que una parte tome la justicia en sus manos. Los tribunales están facultados a intervenir en casos como el de autos para la vindicación de intereses contractuales privados. Véanse: Art. 1044

---

[3] La jurisprudencia federal no ha establecido con claridad qué derechos de negociación colectiva pueden concederse a los empleados de escuelas religiosas mediante leyes laborales federales o estatales sin contravenir la Constitución de Estados Unidos. En *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), se evadió la cuestión constitucional a través de una interpretación restringida de la jurisdicción del estatuto laboral federal. No obstante, en *Catholic H.S. Ass'n. of Archdiocese of N.Y. v. Culvert*, 753 F.2d 1161 (2do Cir. 1985), la controversia constitucional no pudo evitarse y el segundo circuito resolvió que el ejercicio de la jurisdicción de una junta estatal de relaciones del trabajo no violaba las cláusulas religiosas de la Primera Enmienda de la Constitución. Sólo el Tribunal Supremo de Estados Unidos podrá aclarar finalmente este punto. Véase W. Valente, *Education Law: Public and Private*, Minnesota, Ed. West Publishing Co., 1985, Vol. 2, Sec. 21.65, págs. 382–386.

del Código Civil, 31 L.P.R.A. sec. 2994; *Selosse v. Fund. Educ. Ana G. Méndez*, 122 D.P.R. 534 (1988), y casos allí citados. No se trata aquí, como en *Academia San Jorge v. J.R.T.*, supra, de la implantación de la política pública laboral a través de un organismo administrativo del Estado, sino de poner en vigor la voluntad de las partes libremente plasmada en un contrato. Véase *U.T.I.E.R. v. J.R.T.*, 99 D.P.R. 512, 528 (1970).

Dadas las peculiaridades del estatuto laboral allí aplicable, y de que *Academia San Jorge v. J.R.T.*, supra, fue una sentencia emitida sin opinión del Tribunal, sus pronunciamientos no pueden interpretarse como un impedimento al ejercicio de la jurisdicción de los tribunales de Puerto Rico en un caso típico de incumplimiento de contrato como el de autos. Aclarado este extremo, evaluemos si la intervención judicial en este caso viola las cláusulas religiosas de nuestra Constitución.

## IV

La cláusula de libertad de culto garantiza la práctica de las creencias religiosas individuales o colectivas. Aunque la libertad de credo es absoluta, la autonomía para actuar conforme a dichas creencias tiene sus limitaciones. Véase, a modo de ejemplo, *Cantwell v. Connecticut*, 310 U.S. 296, 303–304 (1940). Cuando el Estado, en la promoción de algún fin legítimo gubernamental, afecta adversamente la práctica del culto religioso, esta cláusula constitucional requiere que en algunas circunstancias se hagan concesiones para permitir el libre ejercicio de las creencias religiosas. 3 *Treatise on Constitutional Law: Substance and Procedure* Sec. 21.6, págs. 393–396 (1986).

Ahora bien, no todas las actuaciones gubernamentales que afectan la libertad de culto requieren un acomodamiento. Si son incidentales a una reglamentación uniforme

de actividades seculares, y el interés del Estado es de tal magnitud que sustancialmente sobrepase el reclamo de inmunidad religiosa, prevalecerá el interés gubernamental. *Treatise on Constitutional Law*, supra; Tribe, *op. cit.*, Sec. 14–13; *Wisconsin v. Yoder*, 406 U.S. 205, 214–215 (1972); *Sherbert v. Verner*, 374 U.S. 398, 403 (1962). Realmente el asunto requiere un análisis de balance de intereses de las circunstancias particulares de cada caso. *Treatise on Constitutional Law*, supra, *op. cit.*, Sec. 21.8, págs. 404–409.

La parte que cuestiona una actuación gubernamental bajo la cláusula de libertad de culto tiene inicialmente la obligación de demostrar que el Estado le ha impuesto un gravamen *sustancial* al ejercicio de la religión. *Tony & Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290, 303 (1985). Por consiguiente, las cargas mínimas impuestas por el Estado no son suficientes para activar la cláusula. Tribe, *op. cit.*, Sec. 14–13. Sin esta prueba inicial se hace innecesario proseguir con el análisis de balance de intereses.

En el caso de autos, los recurridos no han demostrado cómo el mero ejercicio del Poder Judicial, para ventilar los méritos de una alegación de incumplimiento del contrato de trabajo libremente pactado entre el maestro demandante y el Colegio, constituye una carga sustancial a la práctica de la religión católica. Los tribunales están facultados a velar por el cumplimiento de los contratos. Esa normativa le aplica a todo contratante en este país.(4) Cualquier

---

(4) Los tribunales de primera instancia en Puerto Rico poseen jurisdicción original general. Sec. 10 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, 4 L.P.R.A. sec. 62. En ausencia de una materia en la cual los tribunales federales tengan jurisdicción exclusiva, *Acevedo v. Srio. Servicios Sociales*, 112 D.P.R. 256, 259 (1982), o de una limitación jurisdiccional estatutaria o constitucional, los tribunales de Puerto Rico tienen jurisdicción para resolver todo tipo de casos y controversias. En nuestro ordenamiento jurídico, cuando se trata de

efecto perjudicial a la práctica de la religión es tan sólo de modo incidental a la reglamentación uniforme de actividades seculares. En esta etapa no se nos ha demostrado que el ejercicio de la jurisdicción judicial constituya per se una violación de la cláusula de libertad de culto.

Esta conclusión no significa que bajo la cláusula de libertad de culto la abstención judicial nunca es apropiada. Más adelante examinaremos cómo esta cláusula puede exigir, según el giro que tome la controversia, que el tribunal se inhiba de pasar juicio sobre el caso.

## V

La cláusula que prohíbe el establecimiento de cualquier religión se utilizó en Estados Unidos para introducir en la doctrina constitucional la ya famosa metáfora del "muro" de separación entre la Iglesia y el Estado. *Everson v. Board of Education*, 330 U.S. 1, 16 (1947). Esta cláusula pretende evitar el patrocinio, el apoyo económico y la participación del Estado en actividades religiosas. *Walz v. Tax Commission*, supra. En la actualidad, las actuaciones gubernamentales impugnadas bajo esta disposición sólo se sostendrán si resisten un escrutinio tripartita desarrollado jurisprudencialmente.

Para que el Estado pueda prevalecer frente a una alegada infracción a esta cláusula, se requiere que la ley o conducta atacada tenga un propósito secular, que su efecto primario o principal no sea promover o inhibir la religión y, finalmente, que no conlleve la posibilidad de provocar una intromisión o interferencia (*entanglement*) excesiva del Gobierno en los asuntos religiosos. *Lemon v. Kurtzman*, 403 U.S. 602, 612–613 (1971); *Meek v. Pittenger*, 421 U.S. 349, 358 (1975); *Com-*

---

particulares que no pueden ponerse de acuerdo sobre sus derechos personales o de propiedad, los tribunales constituyen el foro por excelencia para dirimir esos conflictos. Véase *Vélez Ruiz v. E.L.A.*, 111 D.P.R. 752 (1981).

*mittee for Public Education v. Regan*, 444 U.S. 646, 653 (1980).

Los recurridos argumentan en su alegato, con aparente referencia al tercer requisito del análisis tripartita,(⁵) que la intervención del Estado a través del tribunal implicaría una "intervención excesiva con la Administración de un Colegio Católico" y que "produciría un rudo golpe a la fase de control general". Alegato del recurrido, pág. 8. Señalan, además, que las determinaciones administrativas relativas al despido, cese o separación de un profesor, o la falta de renovarle un contrato de trabajo deben ser respetadas por el Estado por estar "entrañablemente ligadas con la labor docente de una escuela [de orientación] religiosa". Alegato del recurrido, pág. 15. No tienen razón.

Aunque reconocemos el carácter y propósito religioso de las escuelas católicas y la función crítica del maestro en su operación (*Agostini Pascual v. Iglesia Católica*, supra, pág. 178; *Academia San Jorge v. J.R.T.*, supra, págs. 207–212, opinión concurrente del Juez Asociado Señor Negrón García), no podemos convenir con el reclamo de inmunidad religiosa total. Sólo si adoptamos una interpretación absolutista de la cláusula de separación de la Iglesia y el Estado se sostendría ese reclamo. Tal interpretación es inexacta. Con relación a esta cláusula, "el criterio decisivo es la neutralidad de la acción concernida". *Academia San Jorge v. J.R.T.*, supra, pág. 232, opinión disidente del Juez Presidente Señor Trías Monge. En el curso de nuestra vida cotidiana, los campos de acción de la Iglesia y del Estado suelen entremezclarse, con la inevitable consecuencia de que las ac-

---

(⁵) Los recurridos ni siquiera mencionan en su alegato la prueba tripartita de *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Asumimos que aceptan que la actuación gubernamental cumple con los primeros dos criterios. Ello resulta evidente. La facultad judicial para dirimir controversias tiene un propósito y efecto primordial enteramente secular.

tuaciones de cada poder pueden repercutir en la zona del otro. *Agostini Pascual v. Iglesia Católica*, supra, pág. 177; *Lemon v. Kurtzman*, supra, pág. 614. Esa interrelación no convierte automáticamente esas actuaciones en inconstitucionales. Mientras los actos gubernamentales puedan justificarse en términos seculares y no constituyan una *excesiva* intromisión con las autoridades eclesiásticas, serán perfectamente armonizables con la Constitución.

La intervención judicial en la dilucidación de una disputa sobre el contrato de trabajo entre un maestro y una escuela católica no constituye, por sí sola, una interferencia excesiva del Gobierno con las autoridades religiosas. Por otro lado, nos resulta sumamente difícil entender cómo el exigir el cumplimiento de los compromisos contractuales libremente acordados interfiere sustancialmente con la administración de la escuela católica. ¿Significa entonces que los contratos de las escuelas religiosas con sus profesores constituyen meros formalismos sin consecuencias? Adoptar la posición de la recurrida equivaldría conceder a las autoridades religiosas "una licencia para crear un mundo aparte intocable y autócrata . . .". *Sucn. de Victoria v. Iglesia Pentecostal*, supra, pág. 22. Ni siquiera la práctica religiosa "crea un cantón aparte donde le está vedado al Gobierno hacer respetar las leyes". Íd., págs. 21–22. La Constitución no puede escudar del escrutinio judicial hechos puramente seculares meramente porque hayan sido ejecutados por oficiales de una organización religiosa. Véase *In re The Bible Speaks*, 869 F.2d 628 (1er Cir. 1989). Como ya hemos señalado, no se trata de la imposición a la escuela religiosa de un esquema de reglamentación incisivo y penetrante; no hay supervisión constante de una agencia del Estado. Se trata de una intervención gubernamental *incidental* a una controversia entre particulares por diferencias en torno a la interpretación de un contrato.

En conclusión, a la luz de las incidencias habidas en este pleito, consideramos que tampoco se ha demostrado una violación a la cláusula que prohíbe el establecimiento de cualquier religión ni a la que garantiza la separación de la Iglesia y el Estado.

## VI

█ No debemos disponer del planteamiento constitucional sin antes reafirmar un corolario de las cláusulas religiosas de particular relevancia aquí. Los tribunales civiles no pueden ejercitar su jurisdicción para dilucidar disputas sobre derechos de propiedad relativos a una iglesia cuando para hacerlo tengan irremediablemente que pasar juicio sobre materias de doctrina, de disciplina, de fe o de organización eclesiástica interna. Véanse: *Agostini Pascual v. Iglesia Católica*, supra; *Jones v. Wolf*, 443 U.S. 595, 602 (1979); *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710 (1976); *Presbyterian Church v. Hull Church*, 393 U.S. 440, 449 (1969); *Watson v. Jones*, 80 U.S. 679, 727 (1871).

Aunque los derechos emanantes de un contrato no constituyen necesariamente derechos reales o de propiedad, según los conocemos en nuestro Derecho, se consideran como tales para fines de la aplicación de esta norma. Véanse: *Reardon v. Lemoyne*, 454 A.2d 428, 431 (N.H. 1982); *Waters v. Hargest*, 593 S.W.2d 364, 365 (Tex. Civ. App. 1979); *Wiethoff v. St. Veronica School*, 210 N.W.2d 108, 110 (Mich. App. 1973). Después de todo, el problema constitucional no depende de la naturaleza del derecho disputado, sino de la posible interferencia del Estado a través de los tribunales en el corazón mismo de la religión, materia totalmente ajena a nuestra competencia.

█ La aplicación de la doctrina de abstención judicial en materias de índole religiosa requiere que el propio tribunal, luego de la presentación de prueba demostrativa en

ese sentido, haga una determinación de si, a la luz de los hechos ante sí, la controversia requiere pasar juicio sobre cuestiones eclesiásticas. *Black v. St. Bernadette Congr. of Appleton*, 360 N.W.2d 550, 552–553 (Wis. App. 1984). De otro modo, bajo el manto de la religión se podrían esconder las más grandes injusticias. Véase *Cantwell v. Connecticut*, supra, pág. 306. Alegaciones fundamentadas en generalidades no son suficientes para establecer esa determinación. Mientras la controversia pueda dilucidarse mediante la aplicación de principios neutrales de derecho desarrollados para los conflictos terrenales sobre propiedad, un tribunal no infringe las cláusulas religiosas cuando ejercita su jurisdicción. *Jones v. Wolf*, supra, págs. 602–603.

▬▬▬ En el caso de autos, los recurridos no han demostrado cómo el tribunal tendría que pasar juicio sobre materias de doctrina, de fe, de disciplina o de organización eclesiástica en la determinación de si hubo o no justa causa para el despido del recurrente. Ni siquiera se aducen razones religiosas para su despido.(6) Concluimos que erró el tribunal de instancia al desestimar esta acción sin que se le hubiera demostrado la excesiva intromisión del tribunal en materias doctrinarias de la Iglesia Católica.

## VII

Finalmente, el recurrente nos pide que hagamos unas determinaciones de hecho adicionales. Arguye que son estos hechos "los que le dan a este caso su verdadero matiz de

---

(6) Aun cuando se presentaran motivos religiosos para la cesantía del recurrente, ello no privaría inexorablemente al tribunal de jurisdicción para conceder un remedio. Aunque el imponer a la Iglesia la obligación de demostrar que determinada motivación responde a su doctrina religiosa infringe sin duda la constitución, los tribunales pueden determinar, fundándose en otra prueba, que los motivos religiosos aducidos no son realmente la causa del despido y que sólo constituyen un subterfugio que encierra la verdadera razón. Véase *Catholic H.S. Ass'n of Archdiocese of N.Y. v. Culvert*, supra, págs. 1168–1169.

incumplimiento de contrato". No podemos acceder a su solicitud, ya que al haberse desestimado este pleito bajo la Regla 39.2(c) de Procedimiento Civil, 32 L.P.R.A. Ap. III, aún no se ha presentado la prueba de los demandados. Procede que devolvamos este caso al foro de origen para que, luego de desfilada toda la prueba, el tribunal resuelva el caso en sus méritos y en armonía con los principios que hemos expuesto en esta opinión.

Por los fundamentos expresados, *se dictará sentencia revocatoria y se devolverá el caso a la sala de instancia para la continuación de los procedimientos de acuerdo con lo expresado en esta opinión.*

El Juez Asociado Señor Negrón García emitió opinión concurrente y de conformidad.

—O—

Opinión concurrente y de conformidad del Juez Asociado Señor Negrón García.

Al expresar la conformidad con la opinión del Tribunal, recordamos que en *Academia San Jorge v. J.R.T.*, 110 D.P.R. 193, 222 (1980), expusimos:

> Repetimos, no es necesario inmunizar las escuelas de orientación religiosa de *todas las leyes sociales obrero-patronales. Sólo de la jurisdicción de la Junta* y limitado a los maestros por las características particulares del ejercicio de esa *jurisdicción.* Nuestra adhesión a la Constitución nos exige consistencia doctrinal. (Énfasis suplido.)