SENTENCIA
Luego de analizar con detenimiento el expediente de este caso y los alegatos de las partes, revocamos el dicta-men del Tribunal de Primera Instancia. Se devuelve el caso a ese foro para que realice un examen en cámara de los documentos solicitados y dilucide cuáles de las presuntas víctimas tenían, al momento de la denuncia, dieciocho años de edad o más y cuáles eran menores. En cuanto a las que eran menores, el Tribunal de Primera Instancia debe ordenar la divulgación de la información a la fiscalía, bajo los estándares más estrictos de confidencialidad.
En el caso de quienes al momento de la denuncia tenían dieciocho años de edad o más, el foro debe analizar primero, como asunto de umbral, cuáles expedientes, si alguno, contienen comunicaciones privilegiadas al amparo de la Regla 511 de Evidencia, 32 LPRAAp. VI. Las comunicaciones que se hayan manifestado durante el sacramento de la confesión deben excluirse por estar protegidas por el privilegio.
De concluir que no aplica el privilegio, el tribunal deberá resolver si conforme a la cláusula de libertad de culto, el Estado demostró que no existen medidas menos onerosas para obtener la información que obra en los expedientes de la Diócesis de Arecibo. Si concluye que existen alternativas menos onerosas, el Tribunal de Primera Instancia deberá emitir un injunction para dejar sin efecto los subpo *294 enas que emitió la Fiscalía de Arecibo por violar la cláusula de libertad de culto. Art. II, Sec. 3 de la Constitución de Puerto Rico, LPRA, Tomo 1.
Por el contrario, si determina que no existen alternativas menos onerosas y que, en su consecuencia, no se viola la cláusula de libertad de culto, el foro primario deberá hacer valer el derecho constitucional a la intimidad que tienen las presuntas víctimas. Para ello, el tribunal deberá ordenar al Obispo de Arecibo que notifique en un plazo corto a las personas adultas involucradas que existe un requerimiento del Estado a la información íntima que ellas brindaron confidencialmente a la Iglesia Católica. El Obispo de Arecibo deberá certificar al tribunal, bajo juramento, que notificó a esas personas a la última dirección conocida. Se entregará la información al Ministerio Público a menos que la persona notificada lo objete luego de ser notificada debidamente. Debe advertirse a la persona de esta consecuencia y darle un plazo razonable para que conteste. Si una o más de las personas notificadas no acceden a que se revele la información, el Tribunal de Primera Instancia deberá emitir un injunction que deje sin efecto los subpoenas que emitió la Fiscalía de Arecibo en cuanto a la información íntima de las personas que objetaron la entrega, por violar el derecho constitucional a la intimidad que tienen esas posibles víctimas de abuso sexual. Art. II, Sec. 8 de la Constitución de Puerto Rico, LPRA, Tomo 1.
En ambas instancias —sean las posibles víctimas mayo-res o menores de edad— no se entregará al Estado ningún documento o porción de este referente a “cómo la Iglesia Católica y/o las personas que atendieron estos asuntos resolvieron los mismos”. Apéndice, pág. 65.

Notifíquese inmediatamente por correo electrónico o fax y por la vía ordinaria. Publíquese de inmediato.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal Supremo. El Juez Asociado Señor Martínez Torres emitió una opinión de conformidad, a la que se *295 unieron los Jueces Asociados Señores Kolthoff Caraballo, Rivera García y Feliberti Cintrón. La Juez Asociada Señora Rodríguez Rodríguez emitió una opinión disidente, a la que se unieron la Jueza Presidenta Señora Fiol Matta y la Jueza Asociada Oronoz Rodríguez. El Juez Asociado Señor Estrella Martínez emitió una opinión disidente.
(Fdo.) Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

Opinión de conformidad emitida por el
Juez Asociado Señor Martínez Torres, a la que se unieron los Jueces Asociados Señores Kolthoff Caraballo, Rivera García y Feliberti Cintrón.
La adjudicación correcta de este caso requiere que analicemos varios aspectos de nuestro derecho evidenciario y de nuestro derecho constitucional. En primer lugar, debemos analizar si la información que contienen los expedientes en controversia está protegida por el privilegio religioso creyente de la Regla 511 de Evidencia, 32 LPRA Ap. VI. Asimismo, es necesario que estudiemos con detenimiento varias cláusulas constitucionales que han sido invocadas. En particular, es nuestro deber examinar las cláusulas siguientes: (1) la que garantiza la libertad de culto; (2) la que prohíbe el establecimiento de una religión (conocida como “cláusula de establecimiento”), y (3) la que garantiza el derecho a la intimidad. Art. II, Secs. 3 y 8 de la Constitución de Puerto Rico, LPRA, Tomo 1.
En este caso estamos llamados a hacer un fino balance entre el poder del Estado para investigar la comisión de delitos, el derecho a la intimidad de las presuntas víctimas de abuso sexual, el derecho a la libertad religiosa y la separación de Iglesia y Estado.
Luego de analizar la controversia con detenimiento, estamos conformes con la sentencia de este Foro. Este Tribu *296 nal no puede determinar si la información que obra en los documentos producidos en las investigaciones de la Diócesis de Arecibo son comunicaciones privilegiadas al amparo del privilegio religioso-creyente de la Regla 511 de Evidencia, supra. Asimismo, es nuestro criterio que la Diócesis de Arecibo no tiene que entregar los expedientes de las presuntas víctimas que tenían dieciocho años de edad o más al momento de denunciar a menos que se demuestre que el Estado no tiene alternativas menos onerosas para obtener esa información. Si se concluyera que el Estado no tiene alternativas menos onerosas, el foro primario deberá, como ordena la Sentencia de este Tribunal, permitir la divulgación de los expedientes a menos que las presuntas víctimas que tenían dieciocho años de edad o más no consientan a ello. En cuanto a las presuntas víctimas menores de dieciocho años, procede la entrega de la información personal en poder de la Iglesia Católica.
Debe quedar claro que en este caso no se plantea que el Obispo de Arecibo o la Iglesia Católica estén de algún modo encubriendo las actuaciones de sacerdotes pederastas o se nieguen a cooperar en su encausamiento. Por el contrario, de lo que se trata es de un planteamiento dirigido a vindicar derechos constitucionales importantes, reconociendo a su vez el interés del Estado a investigar la comisión de actos delictivos y el indudable interés público de proteger la integridad física y emocional de los menores de edad. Como señaló el Tribunal de Primera Instancia en su sentencia, el abuso de menores es un mal que ha hecho daño a las presuntas víctimas y a la propia Iglesia Católica y hay que combatirlo.
I
El Departamento de Justicia, por conducto del Fiscal de Distrito de Arecibo, emitió varios subpoenas contra el Obispo Católico de la Diócesis de Arecibo, el monseñor Da *297 niel Fernández Torres y su Vicario General, el Rev. Luis Colón García. La información solicitada se relacionaba a unas investigaciones internas que realizó la Diócesis tras recibir varias querellas en las que se denunciaba conducta sexual impropia por parte de sacerdotes. La investigación se realizó conforme al procedimiento uniforme que estableció la Conferencia Episcopal Puertorriqueña, organismo que reúne a todos los obispos católicos de la Isla.
El Obispo de Arecibo encomendó la investigación al Vicario General, quien entrevistó y tomó declaraciones a las presuntas víctimas, querellantes y otros testigos en ausencia de terceros y garantizándoles que la Diócesis mantendría lo comunicado en confidencialidad. Ese proceso produjo varios expedientes que recogieron los documentos preparados durante la investigación. Junto al Vicario General, participaron de la investigación el Obispo, notarios, consultores y profesionales que aportaron pericia, por lo que solamente algunos de los que intervinieron eran sacerdotes o clérigos de la Iglesia Católica. Apéndice, pág. 59. Los hallazgos de la investigación se refirieron a la Congregación para la Doctrina de la Fe, organismo de la Iglesia Católica. El proceso culminó en la expulsión de seis sacerdotes de la Diócesis.
El 30 de enero de 2014 se emitieron los primeros dos subpoenas, uno dirigido al Obispo y otro al Vicario General. Ambos documentos solicitaban que comparecieran o suministraran los nombres, las direcciones y toda la información relacionada a los querellantes (tanto menores como adultos) que hubiesen alegado ser víctimas de delitos sexuales cometidos por sacerdotes adscritos a la Diócesis durante los últimos diez años. También solicitaron información sobre cómo la Diócesis y las personas responsables atendieron y resolvieron las querellas internamente en la Iglesia Católica. Para cumplir con los requerimientos, la Diócesis presentó una lista que contenía los nombres de los sacerdotes contra quienes se presentaron las querellas.
*298 El Fiscal de Distrito de Arecibo emitió dos subpoenas adicionales contra el Obispo. En el primero, se le requirió al Obispo de Arecibo suministrar la misma información solicitada mediante el primer subpoena que le remitieron. En el segundo requerimiento, el Obispo fue citado a comparecer para entregar información sobre la investigación relacionada a los alegados delitos sexuales cometidos para el 2009 por el exsacerdote Edwin Mercado Viera. En esos dos requerimientos se citó al Obispo para que compareciera a la Fiscalía de Arecibo el 12 de febrero de 2014 y entregara la información requerida.
El mismo 12 de febrero de 2014, el Obispo de Arecibo y el Vicario General presentaron una demanda ante el Tribunal de Primera Instancia con el propósito de impugnar los subpoenas emitidos por el Departamento de Justicia. En esencia, solicitaron una sentencia declaratoria y la concesión de un interdicto preliminar y permanente en el que se declarara la inconstitucionalidad de los subpoenas emitidos y, a su vez, impidiera la entrega de los expedientes y documentos requeridos.
El Obispo de Arecibo y su Vicario General basaron su reclamo en los fundamentos siguientes: (1) la libertad de culto; (2) la separación de Iglesia y Estado; (3) el derecho a la intimidad y expectativa de privacidad de la Diócesis en relación a sus documentos y procesos internos de investigación; (4) el derecho de intimidad de las presuntas víctimas denunciantes con respecto a las declaraciones de eventos que expresaron ante la Diócesis y el proceso de sanación emocional y espiritual por el cual atravesaron y, además, (5) el privilegio religioso-creyente que establece la Regla 511 de Evidencia, 32 LPRAAp. VI.
Cónsono con lo anterior, indicaron que los requerimientos sufren de amplitud excesiva y colocan a la Diócesis en riesgo de sufrir un daño irreparable, pues la información solicitada es confidencial y entregarla laceraría su libertad de culto, la cual incluye la facultad de manejar sus asuntos *299 internos y disciplinarios. Además, expresaron que cumplir con los subpoenas interferiría con la facultad de la Diócesis para disciplinar a aquellos clérigos que incurran en prácticas impropias y en la forma de ayudar a los feligreses que son presuntas víctimas de ese tipo de conducta.
El Estado compareció al pleito y solicitó la desestimación de la demanda por no exponer una reclamación que justifique la concesión de un remedio. Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V. Además, sostuvo que el Secretario de Justicia tiene facultad en ley para investigar y procesar todos los casos de naturaleza penal en la jurisdicción de Puerto Rico, por lo que la negativa del Obispo y su Vicario a entregar la información requerida constituye una limitación indebida al poder investigativo del Estado. En cuanto al planteamiento de confidencialidad, el Estado sostuvo que el Departamento de Justicia cuenta con procedimientos adecuados para salvaguardar la confidencialidad de los documentos y de las presuntas víctimas.
El 19 de febrero de 2014, DJMG (interventor) presentó ante el foro primario una demanda de intervención. Indicó que en la actualidad tiene 23 años de edad, que entre los doce y quince años fue abusado sexualmente por un sacerdote de la Diócesis y hace tres años presentó una querella ante la Iglesia Católica por los hechos ocurridos. Señaló que presentó la querella movido por la estricta confidencialidad que cobija el proceso eclesiástico y el dogma de la Iglesia Católica. El interventor informó que obtuvo ayuda sicológica y que quedó satisfecho con los esfuerzos que realizó la Diócesis de Arecibo. Añadió que no le interesa que lo denunciado ante la institución religiosa sea investigado y procesado por las autoridades civiles.
Ante ese escenario, el interventor solicitó que se anularan los subpoenas emitidos y se prohibiera la divulgación de su identidad y circunstancias personales, así como las comunicaciones confidenciales que él emitió a la Diócesis. Cimentó sus reclamos en los fundamentos siguientes: (1) el *300 derecho a la intimidad; (2) la inviolabilidad de la dignidad humana; (3) la libertad de culto, y (4) el privilegio religiosocreyente.
Luego de varios trámites procesales, el 7 de abril de 2014, el Tribunal de Primera Instancia emitió una sentencia mediante la cual declaró la constitucionalidad de los subpoenas en cuestión. Concluyó que procedía la entrega de todos los documentos requeridos por el Departamento de Justicia, excepto las comunicaciones privilegiadas que se emitieron durante el sacramento de la confesión, conforme la Regla 511 de Evidencia, supra. Además, ordenó al Obispo y al Vicario General entregar, en un término de quince días, los documentos solicitados.
En desacuerdo, el Obispo de Arecibo, el Vicario General y el interventor apelaron el dictamen del foro primario ante el Tribunal de Apelaciones. También presentaron una moción en auxilio de jurisdicción en la que solicitaron la paralización de los efectos de la sentencia hasta que se resolviera el recurso de apelación presentado. El foro apelativo intermedio denegó la paralización solicitada.
Mientras el proceso apelativo transcurría en el Tribunal de Apelaciones, el Obispo de Arecibo, el Vicario General y el interventor presentaron ante este Foro una petición de certificación intrajurisdiccional y una moción en auxilio de jurisdicción en las que repitieron los mismos argumentos esgrimidos ante los foros recurridos. El 7 de mayo de 2014 acogimos la petición de certificación y ordenamos la paralización de los efectos de la sentencia. Concedimos a las partes un término simultáneo de quince días para presentar sus alegatos y un segundo término simultáneo de cinco días a partir de la entrega de los alegatos, para replicar.
El Obispo de Arecibo, el Vicario General y el interventor sostienen que el foro primario erró al resolver que las comunicaciones confidenciales realizadas durante la investigación interna que realizó la Diócesis no son comunicaciones privilegiadas al amparo de la Regla 511 de Evidencia, supra. *301 Asimismo, aducen que el Tribunal de Primera Instancia desacertó al adjudicar la controversia ante su consideración sin examinar en cámara la información y los documentos sobre los que reclaman la protección constitucional y el privilegio estatutario.
También expresan que validar la constitucionalidad de los subpoenas emitidos implica ignorar los reclamos de intimidad que adujeron los demandantes en nombre propio, y en representación de las presuntas víctimas y la Diócesis. Además, indican que exigirles que entreguen la información requerida implica una violación a la libertad de culto protegida constitucionalmente.
Por otro lado, el Estado sostiene que es improcedente la tesis de los demandantes y del interventor en cuanto a los derechos constitucionales invocados. En particular, aduce que acoger esa tesis implicaría que cualquier persona se podría escudar en las reglas internas de su religión para neutralizar el poder investigativo del Estado. Además, ex-presa que la información y documentación requerida no está cobijada por el privilegio religioso-creyente.
Con el beneficio de la comparecencia de ambas partes, resolvemos el caso ante nuestra consideración.
II
Conforme con la doctrina de autolimitación judicial, atendemos primero la controversia de derecho probatorio. Si concluyéramos que el privilegio religioso-creyente dis-pone de la controversia entre las partes, evitaríamos pasar juicio innecesariamente sobre una cuestión constitucional. AMPR et als. v. Sist. Retiro Maestros V, 190 DPR 854 (2014); Brau, Linares v. ELA et als., 190 DPR 315 (2014); Rosario v. Toyota, 166 DPR 1, 9 (2006); P.P.D. v. Admor. Gen. de Elecciones, 111 DPR 199, 243 (1981); Pacheco v. Srio. Instrucción Pública, 108 DPR 592, 601 (1979); E.L.A. v. Aguayo, 80 DPR 552, 596 (1958).
*302 A. Aunque el propósito principal de las Reglas de Evidencia es la búsqueda de la verdad, Regla 102 de Evidencia, 32 LPRAAp. VI, nuestro ordenamiento admite a través de los privilegios evidenciarios la exclusión de evidencia pertinente para adelantar intereses sociales que puedan ser ajenos a esta búsqueda. Pagán et al. v. First Hospital, 189 DPR 509 (2013); E.L. Chiesa Aponte, Tratado de derecho probatorio: Reglas de Evidencia de Puerto Rico y federales, San Juan, Pubs. JTS, 2005, págs. 185-186.
Los privilegios evidenciarios buscan adelantar valores e intereses sociales que, por consideraciones de política pública, se estiman superiores a la búsqueda de la verdad. Chiesa Aponte, op. cit, pág. 169. El fundamento tradicional para ello es el utilitarismo. De esa forma, “se estima que el sacrificio de evidencia con claro valor probatorio se justifica para adelantar un alto interés público [...] Mientras más alto sea el interés público que se quiere adelantar con el privilegio, mayor será su alcance y menor las excepciones al privilegio”. E.L. Chiesa Aponte, Reglas de Evidencia de Puerto Rico 2009, San Juan, Pubs. JTS, 2009, pág. 149. Véase, además, Pueblo v. Fernández Rodríguez, 183 DPR 770, 784 (2011).
Como los privilegios evidenciarios son contrarios a la búsqueda de la verdad, la Regla 518 de Evidencia, 32 LPRA Ap. VI, establece que deben ser interpretados de forma restrictiva, salvo los que sean de rango constitucional. El propósito de esa interpretación restrictiva es evitar que se obstaculice el trámite de los procesos judiciales. Rodríguez v. Scotiabank de PR, 113 DPR 210, 214 (1982).
Quien invoca el privilegio tiene el peso de demostrar su existencia mediante preponderancia de la prueba. Pagán et al. v. First Hospital, supra; E.W. Cleary, McCormick on Evidence 6th, St. Paul, Ed. Thompson-West, 2006, Vol. 1, Sec. 73.1, pág. 342. En particular, debe probar los requisitos del privilegio que invoca. Id.
*303 Nuestras Reglas de Evidencia brindan un trato privilegiado a la comunicación que ocurre entre un creyente y un religioso. En ese sentido, la Regla 511 de Evidencia, supra, dispone:

Regla 511. Relación religiosa o religioso y creyente

(a) Según usadas en esta regla, las siguientes expresiones tendrán el significado que a continuación se indica:
(1) Religiosa o religioso.—Sacerdote, pastora, pastor, ministra, ministro, rabino, practicante de una religión, funcionaría o funcionario similar de una iglesia, secta o denominación religiosa o de cualquier organización religiosa.
(2) Creyente.—Persona que le hace una comunicación penitencial o confidencial a una religiosa o un religioso.
(3) Comunicación penitencial o confidencial.—Aquélla hecha por una persona creyente, en confidencia, sin la presencia de una tercera persona, a una que es religiosa y quien, en el curso de la disciplina o la práctica de su iglesia, secta, denominación u organización religiosa, está autorizada o acostumbrada a oír tales comunicaciones y que bajo tal disciplina tiene el deber de mantenerlas en secreto.
(b) Una religiosa o un religioso, o una persona creyente, sea o no parte en el pleito, tiene el privilegio de rehusar revelar una comunicación penitencial o confidencial o impedir que otra persona la divulgue.
Los poseedores del privilegio son las dos personas que participan en la comunicación confidencial, el creyente y el religioso. Surge del Informe del Secretariado de la Conferencia Judicial y Notarial de este Tribunal que la extensión del privilegio a la persona religiosa se fundamenta en que no se le puede compeler a que transgreda las normas de su organización religiosa que la obligan a mantener la comunicación en secreto. Secretariado de la Conferencia Judicial y Notarial del Tribunal Supremo, Informe de las Reglas de Derecho Probatorio, 2007, págs. 280-281.
Para ser considerado religioso conforme a la Regla 511 de Evidencia, supra, es necesario que la persona sea un funcionario afiliado a una secta organizada y reconocida. No se incluyen los ministros autodenominados. Chiesa Aponte, Tratado de derecho probatorio [...], op. cit., pág. *304 281. Por su parte, el término creyente es definido como el sujeto que realiza la comunicación confidencial al religioso. Regla 511 de Evidencia, supra.
No toda comunicación que ocurre entre un religioso y un creyente está protegida por el privilegio. Informe de las Reglas de Derecho Probatorio, supra, pág. 281. Según la Regla 511(a)(3) de Evidencia, supra, una comunicación confidencial o penitencial es aquella que emite un creyente, sin la presencia de terceras personas, a un religioso que en la práctica de su iglesia, secta, denominación u organización religiosa, está autorizada o acostumbrada a oír esas comunicaciones y tiene el deber de mantenerlas en secreto. La actual Regla 511 de Evidencia, id., no requiere que la comunicación confidencial se realice como parte del sacramento católico de la confesión para que sea tratada como privilegiada. Informe de las Reglas de Derecho Probatorio, supra, págs. 280-281. Véase, además, 2 The New Wigmore: A Treatise on Evidence2d Sec. 6.9.1 (2010).
Ahora bien, la Regla 511 de Evidencia, supra, requiere para preservar el privilegio que la comunicación confidencial no se divulgue a terceros. Ese requisito también se encuentra presente en la See. 1032 del Código de Evidencia de California(1), West’s Ann. Cal. Evid. Code Sec. 1032, que sirvió de modelo para la actual Regla 511 de Evidencia, supra, y era parte del texto de la derogada Regla 28 de Evidencia de 1979 (32 LPRA ant. Ap. IV). Informe de las Reglas de Derecho Probatorio, supra, pág. 280.
Durante el proceso de redacción de las actuales Reglas de Evidencia, el Comité Asesor Permanente evaluó la posibilidad de extender el privilegio religioso-creyente a comu *305 nicaciones confidenciales que se divulguen a terceros cuando ello sea necesario para llevar a cabo el propósito de la comunicación. Id. De hecho, los Proyectos de Reglas de Evidencia de esta jurisdicción de 1986 y 1992 contemplaban la posibilidad de invocar el privilegio en situaciones en que se divulgaba la comunicación a terceras personas, siempre que fuera necesario para adelantar el propósito de la comunicación. Véanse: Informe del Proyecto de Reglas de Evidencia de junio de 1992, págs. 72-73 (http:// www.ramajudicial.pr/sistema/supremo/Informe_Reglas-deDerecho-Probatorio-2007.pdf); Comité de Reglas de Evidencia del Secretariado de la Conferencia Judicial, Primer examen de las Reglas de Evidencia de 1979: comentarios y recomendaciones, pág. 172 (http://www.ramajudicial. pr/sistema/supremo/conferencia/Primer-Examen-ReglasEvidencia-1979.pdf). El Comité de Reglas de 1986 y el Proyecto de Reglas de 1992 definían una comunicación confidencial como aquella hecha a un sacerdote, en su carácter profesional como consejero espiritual, “en la confianza de que la misma no será diviulgada a terceras personas, salvo aquellas que sea necesario para llevar a cabo el propósito de la comunicación”. (Enfasis suplido). Id. El lenguaje amplio de esos proyectos provenía, en esencia, de la Regla 506 federal propuesta.(2) Véanse: Informe del Proyecto de Re *306 glas de Evidencia de Junio de 1992, pág. 73; Primer examen de las Reglas de Evidencia de 1979: comentarios y recomendaciones, pág. 175.
Sin embargo, el Comité Asesor Permanente rechazó extender el alcance de la antigua Regla 28 de Evidencia, supra, por lo que no se acogió en las Reglas de Evidencia de 2009 el lenguaje del Comité de Reglas de 1986 ni el Proyecto de Reglas de 1992. Informe de las Reglas de Derecho Probatorio, supra, pág. 280. De esa forma, debemos afirmar que la actual Regla 511 de Evidencia, supra, limita el ámbito del privilegio a las comunicaciones que el religioso debe mantener en secreto y en su consecuencia, no puede revelar a terceras personas.
B. Para determinar si en este caso se configura el privilegio religioso-creyente, es necesario estudiar el proceso que llevó a cabo la Iglesia Católica de Puerto Rico, conforme al procedimiento establecido por la Conferencia Episcopal Puertorriqueña para dilucidar las querellas contra sacerdotes.
Los demandantes lograron probar que las comunicaciones en controversia ocurrieron entre un creyente y un religioso. Regla 511(a)(1) y (a)(2) de Evidencia, supra. También se probó que el religioso estaba autorizado a recibir ese tipo de comunicación según la doctrina católica. Ahora bien, el expediente de este caso no nos permite concluir si las declaraciones en controversia se mantuvieron en secreto, según requiere la Regla 511 de Evidencia, supra.
Claramente, la Regla 511(a)(3) de Evidencia, id., requiere que el religioso no divulgue la comunicación a nadie. En este caso no se presentó prueba, más allá de lo ya señalado, de cómo la Iglesia Católica tramitó los expedientes en controversia. Así las cosas, no podemos resolver si los documentos producidos en esas investigaciones son comunicaciones privilegiadas al amparo del privilegio religioso-creyente de la Regla 511 de Evidencia, supra. Lo único que podemos determinar es que las comunicaciones *307 que se hayan manifestado durante el sacramento de la confesión deben excluirse por estar protegidas por el privilegio. Estamos conformes con la Sentencia de este Foro que concluye que el Tribunal de Primera Instancia deberá dilucidar este asunto luego de examinar los documentos en cámara. Como esto no dispone del caso, pasamos a discutir los planteamientos constitucionales que hacen el Obispo de Arecibo y el interventor.
III
A. El Art. II, Sec. 3, de la Constitución de Puerto Rico, LPRA, Tomo 1, ed. 2008, pág. 280, dispone que “[n]o se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio del culto religioso. Habrá completa separación de la iglesia y el estado”. Esta sección responde a la cláusula de libertad de culto y a la cláusula de establecimiento que consagra la Primera Enmienda de la Constitución de Estados Unidos. Mercado, Quilichini v. U.C.P.R., 143 DPR 610, 633-634 (1997); Asoc. Academias y Col. Cristianos v. E.L.A., 135 DPR 150 (1994). El texto de la Primera Enmienda dispone:
El Congreso no aprobará ninguna ley con respecto al establecimiento de religión alguna, o que prohíba el libre ejercicio de la misma o que coarte la libertad de palabra o de prensa; o el derecho del pueblo a reunirse pacíficamente y a solicitar del Gobierno la reparación de agravios. Enmda. 1, Const. EE. UU., LPRA, Tomo 1, ed. 2008, pág. 181.(3)
El lenguaje sobre la separación entre iglesia y estado que se incluyó en el Art. II, Sec. 3, supra, de la Constitución de Puerto Rico no está contemplado en el texto de la Primera *308 Enmienda. La cláusula sobre separación requiere que se reconozca una especie de jurisdicción a la iglesia, distinta y separada a la del estado, para que las actuaciones de ambas no interfieran entre sí. Mercado, Quilichini v. U.C.P.R., supra, pág. 634.
Existe una tensión entre la cláusula de libertad de culto y la cláusula de establecimiento de la Primera Enmienda que ha impulsado a la jurisprudencia a crear un balance para armonizar su coexistencia. Id.; School Dist. Of Aldington Tp., Pa. v. Schempp, 374 US 203 (1963). Esa discusión se da también en el contexto del Art. II, Sec. 3 de la Constitución local, LPRA, Tomo 1. El choque se evidencia ya que, por un lado, se requiere al Estado no prohibir o inmiscuirse en las prácticas religiosas y, por otro lado, se le prohíbe el establecimiento de una religión. En Mercado, Quilichini v. UCPR, supra, pág. 637, expresamos lo siguiente al respecto:
Ello es así ya que es posible que el Gobierno, con el fin de evitar el establecimiento de una religión, adopte medidas legislativas que tiendan a impedir su práctica. Asimismo, es concebible que un tribunal, al permitir cierto tipo de conducta por parte de algunos creyentes de una religión, en particular al amparo de la libertad de culto, tienda a promover el establecimiento de tal religión, lo cual puede chocar con la primera parte de las disposiciones constitucionales que hoy evaluamos.
B. Mediante la cláusula de libre ejercicio o de libertad de culto se garantiza la práctica de creencias religiosas, impidiendo todo tipo de intervención gubernamental que dificulte esas prácticas. Mercado, Quilichini v. UCPR, supra, pág. 636; Asoc. Academias y Col. Cristianos v. E.L.A., supra. Esa garantía constitucional se circunscribe a prácticas religiosas que protejan la paz, la moral y el orden público. Mercado, Quilichini v. U.C.P. R., supra; Sucn. de Victoria v. Iglesia Pentecostal, 102 DPR 20, 22 (1974). No se trata de una garantía absoluta que sirva de velo para no cumplir con las leyes que promulgue el Estado.
En los casos en que una parte presente un reclamo bajo la cláusula de libre ejercicio, deberá demostrarse que la ac *309 tuación estatal tiene un efecto adverso sobre su práctica religiosa. “La parte que cuestiona una actuación gubernamental bajo la cláusula de libertad de culto tiene inicialmente la obligación de demostrar que el Estado le ha impuesto un gravamen sustancial al ejercicio de la religión”. (Enfasis suprimido). Díaz v. Colegio Nuestra Sra. del Pilar, 123 DPR 765, 779 (1989). Véase Tony and Susan Alamo Foundation v. Secretary of Labor, 471 US 290, 303 (1985). Los tratadistas han apoyado este precepto para activar la cláusula constitucional:
Members of a religious organization [...] who claim an inability to conform their conduct to regulatory statutes, because of religious beliefs, must show that the government regulations impose some burden on their ability to carry out their faith. 6 Rotunda, and Nowak, Treatise on Constitutional Law: Substance and Procedure 5d págs. 261-262 (2013).
Al interpretar el Art. II, Sec. 3 de la Constitución de Puerto Rico, supra, hemos seguido el análisis que se hace tradicionalmente al amparo de la Primera Enmienda de la Constitución federal. Así pues, si se demuestra que la acción estatal tiene un efecto adverso sobre la práctica religiosa, se hace necesario aplicar el siguiente análisis. Díaz v. Colegio Nuestra Sra. del Pilar, supra. Primero, deberá determinarse si la actuación estatal es neutral y de aplicabilidad general. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 US 520, 547 (1993); Mercado, Quilichini v. U.C.P. R., supra. El análisis de neutralidad descansa en establecer si el objetivo de la actuación estatal es suprimir la práctica religiosa. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, supra, pág. 542 (“if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral”).
Además de analizar si es neutral, el tribunal deberá determinar si la actuación estatal es de aplicabilidad general. El Tribunal Supremo federal ha expresado lo siguiente al respecto:
*310 The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, supra, pág. 543.
Una actuación no es general cuando va dirigida únicamente a la iglesia o entidad religiosa y a sus asuntos internos. Mercado, Quilichini v. U.C.P. R., supra, pág. 646. Es decir, cuando la intervención recaiga sobre un asunto interno de la iglesia que solamente afecte a esta última, no se considerará un asunto de aplicabilidad general. Id.
Segundo, si la actuación gubernamental no es neutral o no es de aplicabilidad general, entonces el tribunal aplicará un escrutinio estricto. “A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny”. Church of Lukumi Babalu Aye, Inc. v. Hialeah, supra, pág. 546. En ese supuesto, para prevalecer ante un reclamo bajo la cláusula de libertad de culto el Estado deberá demostrar que: (1) tiene un interés apremiante que justifica sus acciones aun cuando estas tengan el efecto incidental de imponer una carga sobre una práctica religiosa en particular; (2) su acción persigue ese interés, y (3) no existen alternativas que impongan una carga menos onerosa a la religión. Mercado, Quilichini v. U.C.P. R., supra, pág. 637; Asoc. Academias y Col. Cristianos v. E.L.A., supra. Véase, además, Burwell v. Hobby Lobby Stores, Inc., 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014), para un análisis similar según la Religious Freedom Restoration Act of 1993 (RFRA), 42 USC sec. 2000bb et seq. No obstante, cuando las actuaciones del Estado sean neutrales y generalizadas no habrá un conflicto de índole constitucional.
Por otra parte, sabemos que no puede existir una ausencia absoluta de contacto entre la iglesia y el Estado, pues la complejidad de los asuntos del diario vivir inevitablemente provocan una especie de interrelación. Town of Greece, N.Y. v. Galoway, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014); Walz v. *311 Tax Commission of City of New York, 397 US 664 (1970). Por eso, hemos adoptado los criterios siguientes que estableció el Tribunal Supremo de Estados Unidos para determinar cuándo el Estado prevalecerá frente a un reclamo según la cláusula de establecimiento: (1) que la actuación estatal persiga un propósito secular; (2) que no promueva o prohíba la religión, y (3) que no constituya una intromisión excesiva en asuntos religiosos. Asoc. Academias y Col. Cristianos v. E.L.A., supra; Meek v. Pittenger, 421 US 349, 358 (1975); Committee for Public Education v. Regan, 444 US 646, 653 (1980); Lemon v. Kurtzman, 403 US 602, 612-613 (1971). Por este último caso ese escrutinio se conoce comúnmente como el “Lemon test”.
IV
Los hechos en este caso no dan margen a la aplicación de los estándares esbozados según la cláusula de establecimiento, pues no está presente una actuación del Estado que favorezca o promueva la práctica de una religión. Mercado, Quilichini v. U.C.P.R., supra, pág. 635. Ahora bien, entendemos que la cláusula de libre ejercicio aplica a la controversia que nos ocupa.
Lo primero que el Secretario de Justicia solicita por medio de los subpoenas es los nombres, las direcciones y toda la información relacionada a los menores y adultos que alegan haber sido víctimas de delitos sexuales por parte de sacerdotes católicos en los últimos diez años. La Conferencia Episcopal de Puerto Rico creó un procedimiento conforme con las normas propias de los dogmas y las creencias del derecho canónico de la Iglesia Católica. Sentencia TPI, pág. 26. El procedimiento establecido por la Conferencia Episcopal Puertorriqueña para manejar los casos de conducta sexual impropia de los miembros del clero garantiza confidencialidad y privacidad a las presuntas víctimas denunciantes que tenían dieciocho años o *312 más y a los testigos. íd. Esa confidencialidad se adoptó como incentivo para que las presuntas víctimas denuncien a sus ofensores sin temor a caer en el ostracismo público. Una vez se recibe la denuncia, se inicia un proceso de investigación. Id., pág. 22. El procedimiento de la Iglesia Católica establece que se deben informar a las autoridades civiles aquellas situaciones que pudieran constituir maltrato de menores o abuso sexual. Id., pág. 23-24. Ahora bien, si la presunta víctima es, al momento de la denuncia, mayor de dieciocho años, la autoridad eclesiástica no tiene, según las normas internas, la obligación de notificar a la autoridad civil. Id., pág. 23. Es decir, como la víctima tiene capacidad para consentir, se respeta el reclamo de confidencialidad que esta haga.
La entrega de información que revele la identidad de las presuntas víctimas de abuso sexual que eran adultas al momento de la denuncia tiene dos efectos adversos sobre la Iglesia Católica. Primero, contradice la norma de gobierno de la Iglesia que garantiza a las presuntas víctimas que el proceso de investigación sería confidencial y privado. Así pues, la acción estatal impone una carga sustancial al ejercicio de la religión al obligar a la Iglesia a actuar en contra de las normas que pautó para gobernar sus asuntos internos.(4) En segundo lugar, disuade a los creyentes, y posibles futuras víctimas de abuso sexual, de acudir a la Iglesia y denunciar conducta impropia de los miembros del clero por temor a tener que revelar detalles íntimos o a caer en el ridículo y la mofa pública.
Lo contrario ocurre cuando la información solicitada es sobre las presuntas víctimas que eran menores de edad al momento de la denuncia. En ese caso no existe problema ni *313 conflicto alguno, pues las propias normas internas de la Iglesia establecen que se tienen que denunciar ante las autoridades civiles las situaciones en las que la víctima es me-nor de edad. Eso concuerda con el Art. 21 de la Ley Núm. 246-2011 (8 LPRAsec. 1131) que establece, en lo pertinente, que
[t]oda persona estará obligada a informar inmediatamente aquellos casos donde exista o se sospeche que existe una situación de maltrato, maltrato institucional, negligencia y/o negligencia institucional hacia un menor o que existe el riesgo de que un menor sea víctima de dicha situación.
En ese aspecto, el interés del Estado y las normas de la Iglesia Católica son compatibles. La Iglesia Católica no puede alegar que en cuanto a la divulgación de la identidad de los menores de edad existe una carga o interferencia con sus normas internas.
Podemos concluir que por no existir un choque de intereses entre la Iglesia y el Estado en cuanto a la información de las presuntas víctimas que eran menores de edad, no se violó la cláusula de libertad de culto respecto a esa información. Por no haber un conflicto constitucional, pro-cede que la Iglesia entregue la información solicitada en los subpoenas referentes a las presuntas víctimas que eran menores de edad al momento en que denunciaron sus quejas a la Iglesia. En cuanto a las presuntas víctimas adultas, el choque de intereses entre estos dos entes amerita aplicar el análisis desarrollado jurisprudencialmente.
Establecido que la actuación del Estado tiene un efecto adverso en la práctica religiosa de la Iglesia (exceptuando el requerimiento de información sobre las presuntas víctimas que eran menores de edad), procede determinar si la actuación del Estado en cuanto a la información de las presuntas víctimas adultas es neutral y de aplicabilidad general.
En esta ocasión, el objetivo de la actuación estatal es obtener información que le ayude en la investigación criminal de alegados delitos de naturaleza sexual cometidos por cié *314 rigos de la Iglesia Católica. Es por esa razón que los subpoenas se dirigen a la Iglesia. Estos se utilizan comúnmente por parte del Estado para obtener información durante la etapa investigativa de un caso. El propósito que se persigue con los subpoenas no es prohibir o de alguna forma suprimir conducta motivada por creencias religiosas. Por eso, consideramos que la actuación por parte del Estado es neutral.
Ahora bien, los subpoenas van dirigidos exclusivamente a obtener información producto de un procedimiento interno de la Iglesia. De manera selectiva, con su conducta el Estado impone una carga dirigida única y específicamente a la Iglesia Católica. En Mercado, Quilichini v. U.C.P.R., supra, pág. 646, dijimos que “[la] intervención no constituye una actuación estatal de aplicabilidad generalizada y neutral, es decir, ‘que recafiga] uniformemente sobre todo un género de actividades [...]’. [La] intervención recaería sobre un asunto interno de [...] la Iglesia Católica que solamente a ésta afectaría”. (Citas omitidas y énfasis nuestro). Asimismo, en Church of Lukumi Babalu Aye, Inc. v. Hialeah, supra, págs. 545-546, el Tribunal Supremo federal determinó que unas ordenanzas perseguían el interés del Estado únicamente contra conducta motivada por creencias religiosas, por lo que no cumplían con el estándar de aplicabilidad general. En este caso, la información requerida por el Estado mediante subpoenas no afecta a grupos o conducta no religiosa, sino que su efecto recae solamente sobre la Iglesia Católica y su gobierno interno. Por lo tanto, la actuación estatal no satisface el principio de aplicabilidad general.
Como mencionamos, cuando la actuación del Estado cumple tanto con el principio de neutralidad como con el de aplicabilidad general no puede determinarse que se violó la cláusula de libre ejercicio. Mercado, Quilichini v. UCPR, supra, pág. 637; Church of Lukumi Babalu Aye, Inc. v. Hialeah, supra, pág. 546. En esos casos, el Estado no tendrá que satisfacer el escrutinio escrito.
*315 En la controversia que se nos presenta, el requerimiento del Estado a la Iglesia cumplió con el estándar de neutralidad, pero no así con el de aplicabilidad general ya que iba dirigido a obtener información sobre procesos internos de la Iglesia Católica. Procede entonces aplicar el escrutinio estricto. Primero hay que determinar si existe un interés apremiante del Estado que justifique interferir de esa manera con asuntos religiosos. Id.
Sin lugar a dudas, realizar una investigación criminal en casos de delitos de naturaleza sexual persigue un interés social de gran magnitud. En Pueblo v. Ortiz Rodríguez, 147 DPR 433, 440 (1999), afirmamos que “[e]n momentos de violencia, alto uso de drogas, criminalidad y su consabido desasosiego en nuestro diario vivir, el fiel cumplimiento de la ley tiene un interés apremiante”. Hemos dicho, además, que “los delitos [...] no sólo [...] lesionan particulares intereses privados, sino que por el contrario se afectan fundamentales postulados sociales y comunitarios”. Pueblo v. Ramírez Valentín, 109 DPR 13, 17 (1979). Véanse, además: Pueblo v. Díaz, Bonano, 176 DPR 601 (2009); Pueblo v. Muñoz, Colón y Ocasio, 131 DPR 965 (1992); Pueblo v. Pérez Pérez, 115 DPR 827 (1984). Este interés se torna aún mayor ante la presencia de menores. El Estado tiene, más que un interés apremiante, un deber apremiante bajo el concepto parens patriae de proteger a los menores que son víctimas del maltrato y la negligencia. Véanse: Depto. de la Familia v. Soto, 147 DPR 618 (1999); Pérez, Ex parte v. Depto. de la Familia, 147 DPR 556 (1999).
Tanto el foro primario como el Estado dedican varias páginas a discutir jurisprudencia de otras jurisdicciones que, alegadamente, disponen de esta controversia. No obstante, los casos citados son distinguibles de la controversia que nos atañe. Véanse: Roman Catholic Archbishop of Los Angeles v. Superior Court, 131 Cal. App. 4th 417 (2005); Society of Jesus of New England v. Com., 808 N.E. 2d 272 (2004); Hut *316 chison v. Luddy, 606 A. 2d 905 (1992) (no toma en consideración si existía un procedimiento establecido por la Conferencia de Obispos de Estados Unidos que tuviera nor-mas propias de los dogmas y las creencias del derecho canónico de la Iglesia Católica); State v. Wenthe, 839 N.W.2d 83 (2013) (lo que estaba en controversia era la constitucionalidad de un delito tipificado en el ordenamiento legal del estado de Minnesota, Minn. Stat. See. 609.344); People v. Campobello, 348 Ill. App. 3d 619 (2004) (el requerimiento se limitaba al expediente personal del sacerdote y no abarcaba información sensitiva de las víctimas); Com. v. Stewart, 690 A.2d 195 (1997) (no existía un procedimiento establecido por la Conferencia de Obispos de Estados Unidos que tuviera normas propias de los dogmas y las creencias del derecho canónico de la Iglesia Católica y se demostró que no existían medidas menos onerosas para obtener la información requerida).
En este caso no se presentó evidencia que nos permita concluir si la identidad de las presuntas víctimas puede obtenerse por otros medios menos onerosos sin intervenir con la libertad de culto y los procedimientos internos de la Iglesia Católica. Lo único que sabemos es que el Estado posee la lista de todos los sacerdotes expulsados. Desconocemos si la prueba para procesarlos, como lo es el nombre y la información de las presuntas víctimas adultas, puede obtenerse por otros medios, como sería acudir a las parroquias donde trabajaron los sacerdotes para realizar allí entrevistas a diferentes personas, como parte de una investigación de campo rigurosa.
Como no estamos en posición de concluir si la actuación del Estado constituye la alternativa menos onerosa, pro-cede, como ordena la sentencia de este Foro, devolver el caso al Tribunal de Primera Instancia para que dilucide este asunto. Si el foro primario concluyera que existen medidas menos onerosas, deberá emitir un injunction para dejar sin efecto los subpoenas que emitió la Fiscalía de Are *317 cibo en cuanto a toda la información de las presuntas víctimas que eran mayores de dieciocho años al momento de hacer la denuncia a la Iglesia. En cambio, si el tribunal concluyera lo contrario, deberá aplicar el análisis del derecho a la intimidad sobre la información solicitada, según se discute más adelante en esta opinión.
V
Por otro lado, lo segundo que solicitó el Secretario de Justicia fue información sobre “cómo la Iglesia Católica y/o las personas que atendieron estos asuntos resolvieron los mismos”. Apéndice, págs. 304-306. Este requerimiento ex-cesivamente amplio interfiere con los asuntos internos de la Iglesia y viola la libertad religiosa. “ ‘Las organizaciones religiosas, tienen un interés en mantener su autonomía en la organización de sus asuntos internos’ ”. Mercado, Quilichini v. U.C.P.R., supra, pág. 639 (citando a Corporation of Presiding Bishop v. Amos, 483 US 327, 341-342 (1987) (opinión concurrente del Juez Asociado señor Brennan). De lo que se trata es de que estas organizaciones religiosas puedan libremente “seleccionar sus líderes, definir sus propias doctrinas, resolver las disputas internas y administrar sus instituciones [...]”. (Enfasis suplido). Mercado, Quilichini v. U.C.P.R., supra, pág. 640. La institución religiosa merece libertad e independencia del control secular para poder tomar decisiones sin interferencia alguna por parte del Estado tanto en materia de su gobierno interno como también en materia de fe y doctrina. Presbyterian Church in U.S. v. Mary Elizabeth Hull Church, 393 US 440, 448 (1969).
El proceso que llevó a cabo la Iglesia Católica para atender y resolver las alegaciones de las presuntas víctimas de delitos sexuales es un asunto de su gobierno interno. Al atender estos asuntos, la Iglesia Católica Romana tomó decisiones relacionadas con la continuación, *318 terminación y expulsión de varios sacerdotes. Esa función, por definición, va a la esencia misma del gobierno interno de la Iglesia. Requerir ese tipo de información no responde a un interés apremiante del Estado. No es función del Estado pasar un juicio valorativo sobre esos procesos. Esa información no es necesaria para que el Estado pueda continuar con su investigación criminal y de ninguna manera adelantaría el interés del Estado. No existe vínculo alguno entre evaluar asuntos del gobierno interno de la Iglesia y adelantar una investigación criminal. El Estado debe abstenerse de intervenir innecesariamente con las decisiones que toma una iglesia en cuanto a cómo manejar sus cuestiones internas.
Por esa razón, no procede, tal como concluye la Sentencia de este Tribunal, que el Obispo de Arecibo entregue la información sobre cómo y quiénes atendieron los problemas de conducta impropia de algunos miembros del clero.
Por otro lado, cabe destacar que el procedimiento para tramitar las querellas de abuso sexual que hemos estudiado no es ilegal de su faz. “Nuestro Derecho Penal no reconoce como conducta punible la omisión de dar cuenta a las autoridades públicas de un delito cuando se adviene en conocimiento de su comisión. Por consiguiente, en vista de que en Puerto Rico no existe un deber específico de obrar, no es posible incurrir en encubrimiento por conducta omisiva, o sea, por guardar silencio sobre una conducta delictiva conocida”. Pueblo v. León Cortijo, 146 DPR 394, 402 (1998) (opinión de conformidad del Juez Presidente Señor Andréu García). Según el derecho penal, “para incurrir en el delito de encubrimiento debe mediar la intención específica de ayudar al autor de un delito a eludir la acción de la justicia”. (Énfasis suprimido). íd., pág. 403. Eso no es lo que sucede en este caso.
Vindicar el derecho constitucional a la libertad de culto o el derecho a la intimidad de personas adultas no puede considerarse, bajo ningún concepto, que constituye el delito *319 de encubrimiento que tipifica nuestro ordenamiento jurídico en el Art. 280 del Código Penal, 33 LPRA see. 5373.
VI
A. El derecho a la intimidad está expresamente consagrado en la See. 8 del Art. II de nuestra Constitución, LPRA, Tomo 1, ed. 1999, pág. 317, el cual dispone que “[t]oda persona tiene derecho a [la] protección de [la] ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar”. Reiteradamente hemos expresado que este derecho, componente del derecho a la personalidad, goza de la más alta protección bajo nuestra Constitución y representa un ámbito exento capaz de impedir o limitar la intervención de terceros —sean particulares o poderes públicos— contra la voluntad del titular. López Tristani v. Maldonado, 168 DPR 838, 850 (2006).
Los derechos a la dignidad, integridad personal e intimidad son derechos constitucionales fundamentales que gozan de la más alta jerarquía y constituyen una crucial dimensión en los derechos humanos. Su protección es necesaria para que se pueda lograr una adecuada paz social o colectiva. Arroyo v. Rattan Specialties, Inc., 117 DPR 35 (1986). Por eso, los constituyentes expresaron que “[l]a lesión a la intimidad es [...] el más penoso ataque a los derechos fundamentales de la persona”. 4 Diario de Sesiones de la Convención Constituyente 2567 (1951). Véase, además, Acarón et al. v. D.R.N.A., 186 DPR 564, 577 (2012). El carácter privilegiado y la primacía de este derecho en nuestro ordenamiento nos han motivado a hacerlo valer frente a entes privados y prescindir así del requisito de acción estatal. Véase Arroyo v. Rattan Specialties, Inc., supra.
Este derecho constitucional impone al Estado y a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos. Colón v. Romero Barceló, 112 DPR 573 (1982). En general, están protegidos *320 dos intereses fundamentales: (1) el interés individual de evitar la divulgación de asuntos personales y (2) el interés de poder tomar decisiones importantes de manera independiente. Arroyo v. Rattan Specialties, Inc., supra, pág. 75. López v. E.L.A., 165 DPR 280 (2005). Nos corresponde aquí indagar sobre el primero de estos intereses, es decir, el de evitar la divulgación de asuntos personales.
Ahora bien, a pesar de que el derecho constitucional a la intimidad es de la más alta jerarquía en nuestro ordenamiento jurídico, no se concibe como un derecho absoluto que “vence a todo otro valor en conflicto bajo todo supuesto concebible”. E.L.A. v. P.R. Tel. Co., 114 DPR 394, 401 (1983). Así pues, ante una alegación de violación a la intimidad, “ ‘[l]a cuestión central [por resolver] es si la persona tiene derecho a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete’ ”. Id., pág. 402, citando Pueblo v. Lebrón, 108 DPR 324, 331 (1979). Para hacer esa determinación, es necesario que concurran dos elementos: (1) el subjetivo, mediante el cual el reclamante, según las circunstancias del caso, alberga una expectativa real de que su intimidad se respete, y (2) el criterio objetivo, es decir, si la sociedad considera razonable tener tal expectativa. Pueblo v. Santiago Feliciano, 139 DPR 361, 384 (1995). En aquellos casos en los que se demuestre que existe un derecho de intimidad y el Estado pretenda interferir con él, tiene que limitar esta interferencia al mínimo, de modo que no se convierta en una intromisión injustificada en ámbitos privados protegidos. López v. E.L. A., supra, pág. 296.
Este Tribunal ha sido particularmente celoso en proteger el derecho a la intimidad cuando el Estado solicita a ciertas entidades información sensitiva de terceras personas. Por ejemplo, en el contexto de un requerimiento de documentos, resolvimos en RDT Const. Corp. v. Contralor I, 141 DPR 424, 442 (1996), que las personas tienen una expectativa de intimidad sobre la información de sus *321 cuentas bancarias que está en manos de un banco. Resaltamos entonces que “[a] través de las cuentas bancarias de una corporación se puede obtener información confidencial sobre sus finanzas y su salud financiera, los salarios y beneficios marginales que ofrece a su personal, los asesores que utiliza y los gastos ordinarios y extraordinarios en que incurre”. Id. Destacamos así que las personas “suministran a los bancos una gran cantidad de datos bajo la premisa de que serán utilizados únicamente para propósitos bancarios u otros fines legítimos”. íd.; RDT Const. Corp. v. Contralor II, 141 DPR 861 (1996). Véanse, además, Weber Carrillo v. ELA et al., 190 DPR 688 (2014); Rullán v. Fas Alzamora, 166 DPR 742 (2006) (donde aplicamos esta protección a las copias de las planillas de contribución sobre ingresos); Pueblo v. Loubriel, Suazo, 158 DPR 371, 379 (2003).
B. El Tribunal Supremo de Estados Unidos ha reconocido, asimismo, que los individuos tienen derecho a exigir que no se divulgue su información íntima. Véanse: Nixon v. Administrator of General Services, 433 US 425 (1977); Whalen v. Roe, 429 US 589 (1977). Basados en esos casos, otros tribunales han resuelto que existe un derecho fundamental a evitar la divulgación de información confidencial e íntima relacionada a los abusos sexuales. Bloch v. Ribar, 156 F.3d 673, 686 (6to Cir. 1998) (“the right to prevent the dissemination of confidential and intimate details of a rape implicates a fundamental right”). Véanse, además: Eastwood v. Dep’t of Corrections, 846 F.2d 627, 631 (10mo Cir. 1988) (“This constitutionally protected right [to privacy] is implicated when an individual is forced to disclose information regarding personal sexual matters”); Mangels v. Pena K, 789 F.2d 836, 839 (10mo Cir. 1986) (“Information is constitutionally protected when a legitimate expectation exists that it will remain confidential”).
Ese derecho de las víctimas de abuso sexual tiene su fundamento en los problemas que crea la divulgación de cierta información sensitiva. Así, se han resaltado los su *322 frimientos y la humillación a los que son sometidos las víctimas de abuso sexual:
[A] historie social stigma has attached to victims of sexual violence. In particular, a tradition of “blaming the victim” of sexual violence sets these victims apart from those of other violent crimes. Releasing the intimate details of rape will therefore not only dissect a particularly painful sexual experience, but often will subject a victim to criticism and scrutiny concerning her sexuality and personal choices regarding sex. Bloch v. Ribar, supra, pág. 685. Véase, además, RB. Edelman, Free Press v. Privacy: Haunted by the Ghost of Justice Black, 68 Tex. L. Rev. 1195, 1208 esc. 69 (1990) (“Rape is an act of physical violence which by its very nature is an affront to privacy. It represents forcible exposure of aspects of oneself that are protected by conventions of limited access. These conventions are normally adhered to out of regard for well-being and respect for personal privacy”).
En Puerto Rico, hemos resaltado en múltiples ocasiones el derecho de intimidad que protege a las víctimas de abuso sexual en ciertas circunstancias. Véanse, por ejemplo: Pueblo v. Sharma, 167 DPR 2 (2006); Pena v. Pena, 164 DPR 949, 963 (2005) (“el tribunal debe sopesar los intereses de quien peticiona, frente al derecho a la intimidad de esos menores”); Pueblo v. Arocho Soto, 137 DPR 762, 768 (1994) (“se ha requerido que el acusado demuestre un interés en la evaluación de la víctima lo suficientemente importante como para justificar una invasión al derecho a la intimidad de la víctima en cuestión”); Castro Ortiz v. Mun. de Carolina, 134 DPR 796 (1993).
En Elba A.B.M. v. U.P.R., 125 DPR 294, 322-323 (1990), explicamos diáfanamente el problema que tienen las víctimas de abuso sexual frente al resto de la comunidad:
[L]a víctima de violación sufre otros efectos además de los que se ocasionan como resultado del ataque físico y sexual. “Frecuentemente se produce un ‘segundo ataque’ contra la víctima; éste lo ocasionan los juicios y actitudes de las personas a su alrededor que aunque probablemente involuntarios, provocan un impacto igualmente devastador. El ‘segundo ataque’ no es un simple reflejo de la conducta o las actitudes de un individuo *323 o grupo en relación a una víctima en específico. Más bien es reflejo de un contexto social más amplio en relación con la violación; es la unión de las actitudes históricas y contemporáneas que existen en cuanto a la figura del hombre y la mujer, de sus relaciones, y lo que se espera por parte de ellos como conducta apropiada”. (Citas omitidas).
Claro está, el derecho a la intimidad de las víctimas de abuso sexual no es absoluto. Usualmente, ese derecho choca con el interés del Estado en investigar y procesar el crimen. Bloch v. Ríbar, supra (“in this case implicates both a private and a public interest [...] in prosecution). En esos casos habrá que hacer un balance de los intereses encontrados. Id., pág. 685. Véase, además, Whalen v. Roe, supra. Este análisis de balance de intereses no es ajeno a nuestro acervo jurídico. Véanse, por ejemplo: Lozada Tirado et al. v. Testigos Jehová, 177 DPR 893 (2010); Arroyo v. Rattan Specialties, Inc., supra; E.L.A. v. P.R. Tel. Co., 114 DPR 394 (1983); Sucn. de Victoria v. Iglesia Pentecostal, 102 DPR 20 (1974).
C. Los peticionarios, así como el interventor, reconocen que a las víctimas, que al momento de la denuncia eran menores de edad, no se les ofreció una garantía de confidencialidad y que no tienen una expectativa razonable de intimidad. Por eso, es innecesario profundizar en ese aspecto. Además, alegan ante nos que el derecho de intimidad protege los nombres de las presuntas víctimas de abuso sexual que al momento de la denuncia tenían dieciocho años o más. Enmarcan ese reclamo en el contenido de la información y la manera confidencial bajo la que se divulgó. Luego de analizar todos los puntos de vista, concluimos que tienen razón.
Lo primero que hay que dilucidar es si, según las circunstancias del caso, las presuntas víctimas adultas albergan una expectativa real de que su intimidad se respete. Entendemos que sí. El procedimiento que adoptó la Conferencia Episcopal Puertorriqueña tenía como regla general la confidencialidad y la privacidad cuando las presuntas *324 víctimas denunciantes fuesen mayores de edad. Para incentivarles a declarar sobre asuntos íntimos, como lo son incidentes de conducta sexual, expresamente se les garantizó que no se divulgaría su información. Apéndice, pág. 60. Estas personas abrigan hoy la expectativa subjetiva de que no se dé a conocer su información íntima. Id. No olvidemos que se trata de información relacionada con la integridad sexual de seres humanos.
Ahora bien, ¿la sociedad considera razonable tener esa expectativa? Concluimos que sí. Las víctimas de abuso sexual, como expusimos, están sujetas al escarnio público y la divulgación de esa información las somete usualmente al estigma que conlleva haber sido abusado sexualmente. Muchos podrían culpar a las víctimas por los hechos y levantar sospechas sobre sus vidas íntimas. Esas víctimas pudieran llegar a perder el respeto de sus pares. En otras palabras, podrían ser revictimizadas. Por eso, estamos llamados a proteger la información de las víctimas adultas que, como en este caso, está en manos de terceros. Si anteriormente hemos brindado protección a información económica y financiera que está en manos de terceros, ¿cómo no darla a unas víctimas de abuso sexual que confiaron en un proceso confidencial y revelaron detalles de lo más íntimo de su vida? No tiene sentido proteger información que se brindó a ciertas entidades para fines comerciales y, por otro lado, permitir la divulgación de información incluso más íntima, como es aquella de conducta sexual, que un tercero legítimamente prometió expresamente no develar.
Por ejemplo, en este caso, el interventor, un joven adulto de 23 años, expuso que los hechos en los que se vio involucrado “constituyeron una experiencia desagradable, que no interesa volver a recordar ni revivir, y de cuya experiencia se ha podido sobreponer”. Apéndice, pág. 388. Imaginamos la humillación que revivirá este joven si la Iglesia Católica revela que fue una de las víctimas de abuso sexual. Luego de haber superado el proceso, lo obligaríamos a revivir *325 cada uno de esos momentos dolorosos, con todo lo que ello implica.
En conclusión, las presuntas víctimas en este caso, que tenían dieciocho años o más al momento de hacer la denuncia, poseen una expectativa de intimidad sobre la información relacionada al abuso sexual a su persona que revelaron a un tercero. Esa expectativa de intimidad impide, tal como concluye la Sentencia de este Foro, la divulgación de esa información si la presunta víctima objeta.
Como expusimos anteriormente, el Estado tiene un interés apremiante en investigar y procesar los crímenes de abuso sexual que cometieron ciertos sacerdotes católicos. Pueblo v. Ramírez Valentín, 109 DPR 13 (1979). Sin embargo, en el balance de intereses que venimos llamados a hacer entre el poder investigativo del Estado y el derecho a la intimidad, la balanza en este caso específico se inclina a favor del derecho a la intimidad, y en su consecuencia, a la no divulgación de la información íntima de feligreses adultos que está en poder de la Iglesia Católica con un acuerdo de confidencialidad. Tenemos constancia en el expediente judicial de que al menos una de las víctimas de abuso sexual (el interventor) se ha opuesto tenazmente a que su información se divulgue. Las presuntas víctimas son hoy personas adultas que decidieron rehacer su vida y dejar atrás el calvario del abuso sexual. Estas personas nunca han acudido a las autoridades del Estado para reparar su agravio, y más importante aún: la información la posee un tercero que la obtuvo bajo un proceso que era expresamente privado y confidencial.
En este caso no podemos aplicar de forma automática los remedios dispuestos en RDT Const. Corp. v. Contralor I, supra, y su progenie. En esos casos, el Estado sabía a quién pertenecía la información protegida por el derecho a la intimidad. Por el contrario, aquí es la propia identidad del poseedor del derecho lo que se busca proteger. No podemos brindar el mismo trato a dos situaciones fácticas distintas.
*326 Dicho de otro modo, (1) la naturaleza sexual de la información sensitiva que brindaron las presuntas víctimas a la Iglesia y (2) la garantía de confidencialidad que la Iglesia brindó a las presuntas víctimas nos hace inclinar la balanza a favor de la no divulgación. El análisis podría ser distinto si estas dos circunstancias no estuviesen presentes. Es decir, no estamos resolviendo que todas las personas que han sufrido abuso sexual tienen un derecho de intimidad bajo cualquier circunstancia concebible sobre el incidente del que fue víctima.
Por otra parte, el Estado alega que la negativa de la Iglesia a revelar los nombres de las presuntas víctimas de abuso sexual equivaldría a reconocerles a estas un derecho al veto del procesamiento de un delincuente. Eso no es correcto. El argumento del Estado tiene una falla lógica.
Es cierto que “[e]n nuestra jurisdicción, y conforme a lo dispuesto por nuestro ordenamiento jurídico, la facultad y responsabilidad de investigar los hechos delictivos y la decisión de a qué persona acusar y procesar criminalmente y por qué delito, recae en la persona del Secretario del Departamento de Justicia de Puerto Rico y de los fiscales bajo su supervisión”. Pueblo v. Castellón, 151 DPR 15, 24 (2000). Sin embargo, este caso no trata sobre si las víctimas pueden decidir acusar o no a los sacerdotes expulsados. El Estado siempre conserva esa facultad para ejercerla en cualquier momento. Lo que no puede hacer el Estado es obtener forzadamente la información íntima de las presuntas víctimas que está en posesión de un tercero.
Además, el Estado alega que la información que entregue la Iglesia Católica será, de acuerdo con ciertas normas legales, mantenida en secreto. Para ello cita el Art. 13 de la Ley Orgánica del Departamento de Justicia, según enmendado por el Plan de Reorganización de 2011, 3 LPRA see. 292j, que establece:
La información obtenida como resultado de la investigación realizada es confidencial y debe mantenerse en un expediente *327 investigativo, el cual no puede ser objeto de inspección, examen, ni divulgación mientras se conduce la investigación. La información así recopilada puede ser divulgada una vez concluida la investigación, conforme las normas que adopte el Secretario mediante reglamento, excepto en aquellos casos en que suijan las siguientes situaciones:
(a) Una ley o reglamento declare la confidencialidad de la información.
(b) Se revele información que pueda lesionar derechos fundamentales de terceros.
(c) La comunicación esté protegida por alguno de los privilegios evidenciarios que pueden invocar los ciudadanos.
(d) Se trate de la identidad de un confidente.
(e) Sea información oficial conforme a las Reglas de Evidencia, Ap. VI del Título 32.
(f) Se revelen técnicas o procedimientos de investiga [ción].
Esa garantía, dados los intereses involucrados y las particularidades del caso, resulta insuficiente. Nótese que la misma ley dispone que la información recopilada por el Estado podrá ser divulgada una vez concluya la investigación. De hecho, el Reglamento adoptado para eso resulta más insuficiente aún si consideramos que en Puerto Rico existe un derecho constitucional a la información que posee el Estado. Véanse, por ejemplo: Nieves v. Junta, 160 DPR 97, 111 (2003) (“el derecho a la información pública es fundamental”); Soto v. Srio. de Justicia, 112 DPR 477 (1982). Véanse, además: Florida Star, The v. B.J.F., 491 US 524 (1989); Cox Broadcasting Corp. v. Cohn, 420 US 469 (1975).
De cualquier modo, el derecho a la intimidad de las víctimas opera en primer lugar contra el Estado. Weber Carrillo v. ELA et al., supra. Por eso, aun si el Departamento de Justicia no divulgara la información a terceros, persiste el problema de la violación de la expectativa de intimidad de las víctimas frente al requerimiento del Estado. íd.
VII
Por todo lo anterior, estamos conformes con la Sentencia de este Tribunal en la que se revoca al foro primario. Pro- *328 cede devolver el caso a ese foro para que realice un examen en cámara de los documentos solicitados y dilucide cuáles de aquellas presuntas víctimas al momento de la denuncia tenían dieciocho años de edad o más y cuáles eran menores. En cuanto a los que eran menores, el Tribunal de Primera Instancia debe ordenar la divulgación de la información a la fiscalía, bajo los estándares más estrictos de confidencialidad.
De acuerdo con lo discutido, en el caso de los que al momento de la denuncia tenían dieciocho años de edad o más, el foro debe analizar primero, como asunto de umbral, cuáles expedientes, si alguno, contienen comunicaciones privilegiadas al amparo de la Regla 511 de Evidencia, supra. Aquellas comunicaciones que se hayan manifestado durante el sacramento de la confesión deben excluirse por estar protegidas por el privilegio.
De concluir que no aplica el privilegio, el tribunal deberá resolver si conforme a la cláusula de libertad de culto, el Estado demostró que no existen medidas menos onerosas para obtener la información que obra en los expedientes de la Diócesis de Arecibo. Si concluye que existen alternativas menos onerosas, el Tribunal de Primera Instancia deberá emitir un injunction para dejar sin efecto los subpoenas que emitió la Fiscalía de Arecibo por violar la cláusula de libertad de culto. Art. II, Sec. 3 de la Constitución de Puerto Rico, supra.
Por el contrario, si determina que no existen alternativas menos onerosas, y que en su consecuencia no se viola la cláusula de libertad de culto, el foro primario deberá hacer valer el derecho constitucional a la intimidad que tienen las presuntas víctimas. Para ello, el tribunal deberá ordenar al Obispo de Arecibo que notifique en un plazo corto a las personas adultas involucradas que existe un requerimiento del Estado a la información íntima que ellas brindaron confidencialmente a la Iglesia Católica. El Obispo de Arecibo deberá certificar al tribunal, bajo jura *329 mentó, que notificó a esas personas a la última dirección conocida. Se entregará la información al Ministerio Público a menos que la persona notificada lo objete luego de ser notificada debidamente. Debe advertirse a la persona de esta consecuencia y darle un plazo razonable para que conteste. Si una o más de las personas notificadas no acceden a que se revele la información, el Tribunal de Primera Instancia deberá emitir un injunction que deje sin efecto los subpoenas que emitió la Fiscalía de Arecibo en cuanto a la información íntima de las personas que objetaron la entrega, por violar el derecho constitucional a la intimidad que tienen esas posibles víctimas de abuso sexual. Art. II, Sec. 8 de la Constitución de Puerto Rico, supra.
En ambas instancias —sean las posibles víctimas mayo-res o menores de edad— no se entregará al Estado ningún documento o porción de este referente a “cómo la Iglesia Católica y/o las personas que atendieron estos asuntos resolvieron los mismos”. Apéndice, pág. 65. Esa parte del subpoena interfiere con los asuntos internos de la Iglesia Católica y no es necesaria para el propósito secular que persigue el requerimiento, por lo que se debe dejar sin efecto.

 La See. 1032 del Código de Evidencia de California establece:
“As used in this article, ‘penitential communications’ means a communication made in confidence, in the presence of no third person so far as the penitent is aware, to a member of the clergy who, in the course of the discipline or practice of the clergy member’s church, denomination, or organization, is authorized or accustomed to hear those communications and, under the discipline or tenets of his or her church, denomination, or organization, has a duty to keep those communications secret”. West’s Ann. Cal. Evid. Code Sec. 1032.

 La propuesta Regla 506 de Evidencia federal lee de la siguiente forma:
“(a) Definitions. As used in this rule:
“(1) A ‘clergyman’ “ is a minister, priest, rabbi, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.
“(2) A communication is “ ‘confidential’ ” if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.
“(b) General rule of privilege. A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as a spiritual advisor.
“(c) Who may claim the privilege. The privilege may be claimed by the person, by his guardian or conservator, or by his personal representative if he is deceased. The clergyman may claim the privilege on behalf of the person. His authority so to do is presumed in the absence of evidence to the contrary”. Citado en L. Whittaker, The Priest-Penitent Privilege: Its Constitutionality and Doctrine, 13 Regent U.L. Rev. 145, 148 esc. 32 (2001).

 El texto original en inglés es el siguiente:
“Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances”.

 La Sentencia del Tribunal de Primera Instancia, Apéndice, pág. 66, otorga demasiado valor al hecho de que el Arzobispo de San Juan, Mon. Roberto González Nieves, entregó irnos expedientes al Departamento de Justicia. Sin embargo, no existe ni un ápice de evidencia en el expediente que nos ilustre sobre el contenido de la información entregada. Por ejemplo, desconocemos si los documentos entregados contenían informaciónsensitiva de denunciantes menores de edad o de personas adultas.